# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:18-CV-00586-RJC-DSC

| | |
|---|---|
| JANE DOE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM AND RECOMMENDATION** |
| ) | |
| KERR PUTNEY, CITY OF ) | |
| CHARLOTTE, ANTHONY PERKINS, ) | |
| BRADLEY LEAK AND CHARLOTTE ) | |
| MECKLENBURG BOARD OF ) | |
| EDUCATION, ) | |
| ) | |
| Defendants. ) | |

**THIS MATTER** is before the Court on "Defendants Charlotte-Mecklenburg Board of Education and Anthony Perkins' Motion to Dismiss (document # 27) filed January 15, 2019.

This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and this Motion is now ripe for consideration.

Having fully considered the arguments, the record, and the applicable authority, the undersigned respectfully recommends that Defendants' Motion to Dismiss be granted in part and denied in part as discussed below.

## I. PROCEDURAL AND FACTUAL BACKGROUND

This is an action seeking damages pursuant to Title IX of 20 U.S.C. §§ 1681 and 42 U.S.C. § 1983 for violations of Plaintiff's rights under the United States Constitution as well as for state law claims.

Accepting the allegations of the First Amended Complaint as true, on November 3, 2015, at around 6:30 a.m., Plaintiff and several friends were in the Language Arts building at Myers Park High School waiting for classes to begin when a male student, Q.W., sent her text messages asking her to skip class with him that day. Plaintiff declined. Q.W. then offered to walk Plaintiff from the LA building to her first period class at the gym across campus. Q.W. met Plaintiff at the LA building and the two began walking to the gym. As they walked, Q.W. continued to pressure Plaintiff to skip class with him. Plaintiff repeatedly declined. As the two walked near a parking area on campus, Defendant Leak was present and on duty as the School Resource Officer for MPHS.

When Leak saw Plaintiff and Q.W., he called out to Plaintiff asking where she was going. Q.W. grabbed and squeezed Plaintiff's arm and pulled her into the woods on CMS property adjacent to MPHS's main campus. Frightened by Q.W.'s aggression, Plaintiff did not respond to Leak. While in the woods, Plaintiff again told Q.W. that she did not want to skip class and get in trouble. She was fearful for her safety and protested Q.W.'s actions, but he did not relent and instead pulled her further into the woods. Plaintiff began sending text messages to friends asking for help.

Plaintiff's friend J.D. immediately sought out Leak and reported the abduction and Plaintiff's text messages. Leak took no action. Instead, Leak challenged Plaintiff's friend about the veracity of her report. J.D. then sent a text message to Plaintiff indicating that Leak was refusing to help. Leak radioed for Defendant Perkins, an assistant principal, to come down to confer in his office. When Perkins arrived, Leak informed him that J.D. was "saying that her friend has been kidnapped."

Perkins did not respond to the report. J.D. sent a text message to Plaintiff and their friends stating, "Their [sic] not believing her." At the same time, Plaintiff was also sending text messages to her mother pleading for help. Plaintiff's mother asked her husband to contact MPHS in order to locate their daughter. When Plaintiff's father called MPHS, he spoke directly to Leak who was still talking with J.D. Perkins had arrived in Leak's office at some point during Leak's phone conversation with Plaintiff's father.

During the call with Plaintiff's father, Leak confirmed that he had observed Q.W. and Plaintiff walking on campus earlier that morning. Leak then stated that she was skipping class voluntarily, although she had no disciplinary or truancy history at MPHS. This discouraged Plaintiff's father from taking any further action at that time to locate his daughter.

During the time that Leak and Perkins were deciding whether to respond at all to the report of Plaintiff's abduction, Q.W. sexually assaulted Plaintiff. Around 7:50 a.m., Plaintiff informed her mother via text message of the sexual assault stating, "I was attacked." Her parents again contacted MPHS to demand that officials locate their daughter.

Leak and Perkins ultimately began to investigate and located Q.W. and Plaintiff outside the woods. Plaintiff was distressed and disheveled. Her hair was in disarray, she had mud on her clothing, her glasses were broken, and there was semen on her shirt. Despite her obvious distress, Leak directed Plaintiff to sit next to Q.W. in the back seat of his patrol vehicle, which she refused to do. Leak then put her in the front seat next to him while Q.W. remained in the back seat with Perkins, who now had J.D.'s cell phone in his possession. Plaintiff was in shock and terrified of Q.W. who was seated directly behind her. She was unable to provide a report to Leak and Perkins at that time.

During the drive back to campus, Plaintiff sent text messages to J.D. in quick succession saying, "I was attacked"; "I feel so gross"; "If I have aids ima kill myself" [sic].  Unbeknownst to Plaintiff, Perkins received those text messages on J.D.'s cell phone and read them in real time.  Once back on campus, Perkins removed Q.W. from the patrol vehicle and took him to Leak's office.  Leak then spoke with Plaintiff and she confirmed that Q.W. had sexually assaulted her.  Back in Leak's office, Q.W. claimed that he had consensual oral sex with Plaintiff.  Despite having knowledge that Plaintiff had reported both an abduction and sexual assault, Perkins failed to ask Q.W. for any pertinent details.  Instead, he accepted Q.W.'s version of events without conducting any investigation.

In his report, Perkins described the incident as "mutual sexual contact between two students."  Despite having actual notice that Plaintiff reported an abduction and sexual assault by Q.W., neither Leak nor Perkins took a statement from Plaintiff or otherwise investigated her complaint.  Neither Defendant offered to transport Plaintiff to a hospital or assist her in making a police report.

Perkins omitted any reference to the attack in a statement he prepared for CMS, saying "[Plaintiff] text[ed] that she feels gross and she better not have an STD."  And in an incident report he prepared on the morning of the assault, Perkins classified the "offense type" as "mutual sexual contact between two students," notwithstanding his knowledge that Plaintiff reported being "attacked" by Q.W.  Perkins also reported in his statement to CMS that Plaintiff's "clothes were not dirty, and her hair was not out of place."

During the time at issue, Leak and other CMS officials including Perkins had knowledge of sexual misconduct committed by male students against female students in the woods adjacent to the MPHS campus.  One incident of sexual assault occurred on or about October 22, 2014.  CMS

had received so many reports of alleged sexual misconduct in the woods that Principal Bosco convened a student assembly in the fall of 2015 to discuss the situation. That assembly was held before the events at issue here.

During the assembly, Principal Bosco told the students "some people go into the woods and don't come back happy." He warned female students that MPHS could not protect them if they went into the woods, and told male students that "in these cases, you're guilty until proven innocent because that's just the price we pay for being men." CMS promulgated a school policy in its 2015-2016 Student Handbook, which states: "Students may not leave campus without permission from an administrator, doing so will result in the student being considered truant."

Plaintiff alleges that Defendant CMS failed to provide training or education to its employees, agents, students and their parents under Title IX to ensure a proper and lawful response to student-against-student sexual harassment. Plaintiffs also allege that CMS failed to provide training or education to its employees, agents, students and their parents to protect students from sexual harassment and violence. CMS had no Title IX coordinator or other employees designated to address complaints of sexual harassment.

On November 1, 2018, Plaintiff initiated this action alleging seven claims for relief: a claim against CMS under 20 U.S.C. §§ 1681 for pre and post-report violations of Title IX; a claim against CMS, Leak, and Perkins under 42 U.S.C. § 1983 for violations of Title IX and Plaintiff's Constitutional rights under the Equal Protection clause of the Fourteenth Amendment; a claim against CMS, the City, and Putney under 42 U.S.C. § 1983 for failure to train; a claim against Leak and Perkins for negligence; a claim against Leak and Perkins for negligent infliction of emotional distress; a claim against the City and Putney for negligent hiring, training, retention, and supervision; and a claim against Leak and Perkins for common law obstruction of justice.

On January 15, 2019, CMS and Perkins filed their Motion to Dismiss. Doc. 27. They argue that Count I against CMS should be dismissed because Plaintiff failed to allege facts that an appropriate school official had notice of her claim of sexual assault; Plaintiff's official capacity claims against Perkins should be dismissed as duplicative of her claims against CMS; Count II against Perkins should be dismissed because Plaintiff has failed to adequately allege an underlying Constitutional violation and Perkins is entitled to qualified immunity; Counts II and III against CMS should be dismissed because Plaintiff has failed to allege a Constitutional violation by a CMS state actor and failed to adequately plead municipal liability; Counts IV and V against Perkins should be dismissed because CMS and Perkins have governmental immunity and Perkins is entitled to public official immunity; and that Count VII should be dismissed because Plaintiff failed to allege that Perkins interfered with a pending or potential official proceeding.

## II. DISCUSSION

### 1. Standard of Review

In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563. A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the Plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In Iqbal, the Supreme Court articulated a two-step process for determining whether a complaint meets this plausibility standard. First, the court identifies allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555) (allegation that government officials adopted challenged policy "because of" its adverse effects on protected group was conclusory and not assumed to be true). Although the pleading requirements stated in "Rule 8 [of the Federal Rules of Civil Procedure] mark[] a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a Plaintiff armed with nothing more than conclusions." Id. at 678-79.

Second, to the extent there are well-pleaded factual allegations, the court should assume their truth and then determine whether they plausibly give rise to an entitlement to relief. Id. at 679. "Determining whether a complaint contains sufficient facts to state a plausible claim for relief "will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]-'that the pleader is entitled to relief,'" and therefore should be dismissed. Id. (quoting Fed. R. Civ. P. 8(a)(2)).

### 2. Claims against Charlotte-Mecklenburg Board of Education

Plaintiff asserts three claims against CMS in the First Amended Complaint. She seeks damages for both Title IX and civil rights violations under 42 U.S.C. § 1983 for pre and post report violations and for failure to train.

#### a. Title IX Claim

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In Davis v. Monroe County Board of Education, the Supreme Court found that Title IX's prohibition on sex-based discrimination encompasses student-on-student sexual harassment where the school "is deliberately indifferent to known acts of student-on-student harassment and the harasser is under the school's disciplinary authority." 526 U.S. 629, 646–47 (1999). The Court held that "funding recipients are properly liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Id. at 650. Thus, to prove a Title IX claim on the basis of student-on-student sexual harassment, a plaintiff must show that (1) she was a student at an educational institution receiving federal funds; (2) she was subjected to harassment based upon her sex; (3) the harassment was so severe, pervasive, and objectively offensive that it created a hostile or abusive educational environment; and (4) the educational institution had actual knowledge of the harassment but was deliberately indifferent. See Davis, 526 U.S. at 650; Rouse v. Duke Univ., 535 F. App'x 289, 293 n.* (4th Cir. 2013) (per curiam) (unpublished); Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007) (en banc).

The Fourth Circuit requires that the institution have actual knowledge of harassment against the plaintiff. Alleged knowledge of prior acts of sexual harassment against other students is insufficient to establish liability. Baynard v. Malone, 268 F.3d 228, 238 (4th Cir. 2001); see also Facchetti v. Bridgewater College, 175 F. Supp.3d 627, 639 (W.D. Va. 2016) ("[Plaintiff] cites to a number of cases for the proposition that prior harassing conduct need not be 'Plaintiff specific' or involve the same perpetrator that assaulted the Plaintiff for a university's deliberate indifference to prior complaints to result in Title IX liability.... In the Fourth Circuit, though, there is a requirement that the defendant have actual notice of harassment against the plaintiff."). A university's knowledge of prior sexual misconduct by the same assailant with other students or of potential abuse is insufficient to establish a Title IX claim. Id.

Perkins received three separate reports that Plaintiff had been taken into the woods adjacent to MPHS against her will by a male student. Perkins later observed visible evidence that Plaintiff had been sexually assaulted. Her hair was in disarray, she had mud on her clothing, her glasses were broken, and there was semen on her shirt. Perkins also read, in real time, the text messages from Plaintiff stating, "I was attacked"; "I feel so gross"; and "If I have aids ima kill myself" [sic]. Those text messages put him on notice that not only was Plaintiff "attacked," but the attack was sexual in nature.

Plaintiff also told Leak that she had been sexually assaulted by Q.W. Drawing all reasonable inferences in favor of Plaintiff at this stage, the Court can infer that Leak and Perkins would have conferred about Plaintiff's allegations. Perkins had actual knowledge of the sexual assault and the allegations here are sufficient to withstand dismissal under Rule 12(b)(6). For those reasons, the undersigned respectfully recommends that Defendant's Motion to Dismiss Plaintiff's Title IX claim be denied.

### b. § 1983 Claims

Plaintiff asserts § 1983 claims against CMS for civil rights violations and for failure to train. "A municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under § 1983." City of Canton v. Harris, 489 U.S. 378, 385 (1989) (citing Monell, 436 U.S. at 694-95); see also Carter v. Morris, 164 F.3d 215, 218 (4th Cir.1999). A plaintiff seeking to impose liability on a municipality for the constitutional torts of its employees under § 1983 must prove that some municipal "policy" or "custom" caused a deprivation of the plaintiff's rights. Monell, 436 U.S. at 694.

The Fourth Circuit has long recognized Monell and its progeny requiring the plaintiff to adequately plead and prove the existence of an official policy or custom that proximately caused a deprivation of rights. Walker v. Prince George's Cnty., 575 F.3d 426, 431 (4th Cir. 2009). Furthermore, the identification of a specific municipal policy or custom is a threshold requirement. See Semple v. City of Moundsville, 195 F.3d 708, 712 (4th Cir.1999).

"Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." Bd. Of Cmm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403–404 (1997) (citing Monell, 436 U.S. at 694). Furthermore, the Plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Id. at 404.

"Where a Plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Id. at 405; see also City of Canton, 489 U.S. at 391-92.

In Carter v. Morris, 164 F.3d 215 (4th Cir. 1999), the Fourth Circuit identified four possible sources of "official policy or custom" giving rise to municipal liability: (1) "written ordinances and regulations;" (2) "affirmative decisions of individual policymaking officials;" (3) omissions by policymaking officials "that manifest deliberate indifference to the rights of the citizens;" or (4) a practice "so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." Id. at 218. (quotations and citations omitted).

The allegations in Plaintiff's First Amended Complaint do not support a § 1983 Fourteenth Amendment claim against CMS. Plaintiff has not alleged that an official policy, practice, or custom of institutional discrimination led to her injury. She has failed to plead, other than conclusions, that CMS had "a practice that was 'so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law.'" Id. Further, the allegations in Plaintiff's First Amended Complaint fail to rise to the level of deliberate indifference to her Constitutionally based equal protection rights. Id. Plaintiff cites isolated incidents that do not amount to a custom or usage by CMS. For those reasons, the undersigned respectfully recommends that the Motion to Dismiss Plaintiff's § 1983 claim against CMS be granted.

c. **Supplemental Jurisdiction of State Law Claims**

Plaintiff concedes in her Response that her state law tort claims are being asserted against Perkins in his individual capacity only. Therefore, the undersigned respectfully recommends that

the Motion to Dismiss Plaintiff's state law tort claims against CMS and Perkins (in his **official** capacity only) be granted.

### 3. Claims against Perkins

Plaintiff asserts four claims against Perkins in his individual and official capacity. She seeks damages for civil rights violations under 42 U.S.C. § 1983, negligence, negligent infliction of emotional distress, and common law obstruction of justice.

#### a. Official Capacity Claims

Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165-66 (1985). The § 1983 claims brought against Perkins in his official capacity are duplicative of the claims brought against CMS and subject to dismissal. See Ridpath v. Bd. Of Governors Marshall Univ., 447 F.3d 292, 307 n.13 (4th Cir. 2006) (holding that official capacity claims against university administrators were duplicative of claims against its Board of Governors and subject to dismissal); Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004) (holding that official capacity § 1983 claims against school superintendent were duplicative of claims against the school board and subject to dismissal). Accordingly, the undersigned respectfully recommends that Plaintiffs' § 1983 claims against Perkins in his official capacity be dismissed.

#### b. § 1983 Claims

Section 1983 provides relief for civil rights violations committed under color of state law. Jenkins v. Medford, 119 F.3d 1156, 1159–60 (4th Cir.1997). "Under [] § 1983, a Plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." Id. Plaintiff alleges that Perkins was deliberately indifferent to her constitutional rights and acted in bad faith

in writing his report to CMS. Defendant argues that there is no underlying Constitutional violation and that he is entitled to qualified immunity because he acted reasonably in conducting and reporting his investigation.

The Fourth Circuit Court has held:

> "Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Ridpath v. Board of Governors Marshall University, 447 F.3d 292, 306 (4th Cir.2006) (quoting Wilson v. Layne, 526 U.S. 603, 609 (1999)) (internal quotation marks omitted). Officials will receive immunity unless the § 1983 claim satisfies a two-prong test: (1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right and (2) the right was "clearly established" such that a reasonable person would have known his acts or omissions violated that right. Id.; see also Saucier v. Katz, 533 U.S. 194, 201 (2001), modified by Pearson v. Callahan, 555 U.S. 223 (2009) (setting up this two-pronged test).

Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011).

A defendant's actions are assessed from the perspective of an objectively reasonable administrator charged with knowledge of established law. The defendant's motives are irrelevant to the qualified immunity inquiry. Anderson v. Creighton, 438 U.S. 635, 641 (1987). The Supreme Court has held that qualified immunity "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Perkins is not entitled to qualified immunity here. Plaintiff's allegations establish a Constitutional violation of the Equal Protection clause of the Fourteenth Amendment. An objectively reasonable administrator in Perkins' position would not

have delayed investigating an alleged sexual assault or reported that the sexual contact between Plaintiff and Q.W. was "mutual" when he had actual knowledge to the contrary. Perkins' report to CMS stated that Plaintiff's "clothes were not dirty, and her hair was not out of place" even though her father arrived at MPHS and immediately observed his daughter's disheveled appearance.

Plaintiff has plead sufficient facts to show that Perkins acted in bad faith and with deliberate indifference when he failed to investigate the alleged sexual assault and included false information in his report to CMS. For those reasons, the undersigned respectfully recommends that the Motion to Dismiss Plaintiff's § 1983 claim against Perkins in his individual capacity be <u>denied</u>.

   c. **State Law Claims**

      1. **Negligence and Negligent infliction of emotional distress**

Plaintiff alleges that Perkins was negligent in handling the investigation, caused negligent infliction of emotional distress to her, and obstructed justice by interfering with her ability to seek legal redress through the school disciplinary process against Q.W. or otherwise initiating the Title IX grievance process. Perkins argues that he is entitled to public official immunity and did not interfere with a pending or potential official proceeding.

The North Carolina Court of Appeals has held that school superintendents and administrators (which includes assistant principals like Perkins) are "public officials" for purposes of public official immunity. See <u>Farrell v. Transylvania County Board of Educ.</u>, 175 N.C. App. 689, 625 S.E.2d 128 (2006); <u>Gunter v. Anders</u>, 114 N.C. App. 61, 441 S.E.2d 167 (1994). An official enjoys public official immunity "'[a]s long as [he] lawfully exercises the judgment and discretion with which he is invested by virtue of his office ... keeps within the scope of his official authority, and acts without malice or corruption.'" <u>Epps v. Duke University,</u> 468 S.E.2d 846, 851

(N.C. 1996) (citations omitted). Malicious behavior includes "when [one] wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Id. (citations omitted); see also Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir.2003).

Plaintiff claims that Perkins is not entitled to public official immunity because he acted maliciously, corruptly, in bad faith, willfully, or deliberately. Since the Court has concluded that Perkins acted in bad faith when he failed to investigate the alleged sexual assault and falsified his report to CMS, the undersigned respectfully recommends that the Motion to Dismiss Plaintiff's negligence and negligent infliction of emotional distress claims against Perkins be denied.

### 2. Common Law Obstruction of Justice.

Plaintiff alleges that Perkins took actions to obstruct her from obtaining justice after Q.W. sexually assaulted her. Perkins argues that Plaintiff disagrees with the contents of his report and that there are no fact based allegations that he or anyone else obstructed Plaintiff's ability to seek and obtain a legal remedy under Title IX or the CMS disciplinary processes. The Court disagrees.

Common law obstruction of justice makes it "an offense to do any act which prevents, obstructs, impedes, or hinders public or legal justice." Howard v. City of Durham, 1:17-cv-00477, 2018 U.S. Dist. LEXIS 55187, at *16–17 (M.D.N.C. Mar. 31, 2018) (quoting In re Kivett, 309 N.C. 635, 670 (N.C. 1983)). North Carolina courts have held that "any act intentionally undertaken by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy will suffice to support a claim for common law obstruction of justice." See Blackburn v. Carbone, 208 N.C. App. 519, 526, 703 S.E.2d 788, 795 (2010). Even attempts to obstruct justice may be sufficient to state a claim for relief. See Reed v. Buckeye Fire Equip., 241 F. App'x. 917, 928 (4th Cir. 2007) (citing cases); In re Kivett, 309 N.C. at 670 (citation

omitted). Drawing all reasonable inferences in favor of Plaintiff at this stage, the Court can infer that Perkins' falsified report to CMS impeded Plaintiff's ability to seek and obtain a legal remedy through school disciplinary action against Q.W. and the Title IX grievance process.

For those reasons, the undersigned respectfully recommends that the Motion to Dismiss Plaintiff's common law obstruction of justice claim against Perkins be <u>denied</u>.

### III. <u>RECOMMENDATION</u>

FOR THE FOREGOING REASONS, the undersigned respectfully recommends that "Defendants Anthony Perkins and CMS' Motion to Dismiss," Doc. 22, be **GRANTED IN PART** and **DENIED IN PART**, that is, **GRANTED** as to official capacity claims against Perkins, the state law claims against CMS, and the § 1983 claims against CMS, and **DENIED** in all other respects.

### IV. <u>NOTICE OF APPEAL RIGHTS</u>

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within fourteen days after service of same. Failure to file objections to this Memorandum with the District Court constitutes a waiver of the right to de novo review by the District Judge. <u>Diamond v. Colonial Life</u>, 416 F.3d 310, 315-16 (4th Cir. 2005); <u>Wells v. Shriners Hosp.</u>, 109 F.3d 198, 201 (4th Cir. 1997); <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1365 (4th Cir. 1989). Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. <u>Thomas v. Arn</u>, 474 U.S. 140, 147 (1985); <u>Diamond</u>, 416 F.3d at 316; <u>Page v. Lee</u>, 337 F.3d 411, 416 n.3 (4th Cir. 2003); <u>Wells</u>, 109 F.3d at 201; <u>Wright v. Collins</u>, 766 F.2d 841, 845-46 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties <u>and to the Honorable Robert J. Conrad</u>.

**SO ORDERED**.

Signed: June 5, 2019

David S. Cayer
United States Magistrate Judge