# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:18-CV-00586-RJC-DSC

| | |
|---|---|
| **JANE DOE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **KERR PUTNEY, CITY OF** | ) |
| **CHARLOTTE et. al.,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM AND RECOMMENDATION AND ORDER

**THIS MATTER** is before the Court on "Defendants City of Charlotte and Kerr Putney's Motion to Dismiss" (document # 52) filed February 20, 2019.

This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and this Motion is now ripe for consideration.

Having fully considered the arguments, the record, and the applicable authority, the undersigned respectfully recommends that Defendants' Motion to Dismiss be granted in part and denied in part as discussed below.

### I. PROCEDURAL AND FACTUAL BACKGROUND

This is an action seeking damages pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights under Title IX of 20 U.S.C. § 1681 and the Fourteenth Amendment to the United States

Constitution. Plaintiff also brings state law claims for negligent hiring, training, retention and supervision.

Accepting the factual allegations of the First Amended Complaint as true, on November 3, 2015, at around 6:30 a.m., Plaintiff and several friends were in the Language Arts building at Myers Park High School (MPHS) waiting for classes to begin when a male student, Q.W., sent her text messages asking her to skip class with him. Plaintiff declined. Q.W. then offered to walk Plaintiff from the Language Arts building to her first-period class at the gym across campus. Q.W. met Plaintiff at the Language Arts building and the two began walking to the gym. As they walked, Q.W. continued to pressure Plaintiff to skip class with him. Plaintiff repeatedly declined.

As the two walked near a parking area on campus, Defendant Leak was present and on duty as the School Safety Resource Officer (SSRO) for MPHS. SSROs are Charlotte-Mecklenburg police officers who are assigned to work at public schools for a year at a time. When Officer Leak saw Plaintiff and Q.W., he called out to Plaintiff asking where she was going. Q.W. grabbed Plaintiff, squeezed her arm and pulled her into the woods on school property adjacent to the main campus. Frightened by Q.W.'s aggression, Plaintiff did not respond to Leak.

While in the woods, Plaintiff again told Q.W. that she did not want to skip class and get in trouble. She was fearful for her safety and protested Q.W.'s actions, but he pulled her further into the woods. Plaintiff began sending text messages to her friends: "Help me," "Call the cops," "Somebody go to officer Lee [sic]," "Quit calling me; He's watching me," and "Guys I'm being serious; I'm really scared; Nobody is helping."

Plaintiff's friend, J.D., immediately sought out Officer Leak and reported the abduction and Plaintiff's text messages. According to an audio recording, Officer Leak took no action upon the report of Plaintiff's abduction. Instead, Officer Leak challenged J.D. about the veracity of

Plaintiff's report. Officer Leak radioed for Defendant Perkins, an assistant principal, to confer in his office. When Perkins arrived, Officer Leak informed him that J.D. was "saying that her friend has been kidnapped." Perkins did not respond to the report. J.D. sent a text message to Plaintiff and their friends stating, "Their [sic] not believing her."

At the same time, Plaintiff was also sending texts to her mother: "Mom I'm being kidnapped; Call somebody. Dont call me," "All I know is. I'm scared asf. I told him I didn't want to do this," and "I think he's crazy." Plaintiff's mother asked her husband, Plaintiff's father, to contact MPHS to locate their daughter. When Plaintiff's father called MPHS, he spoke directly to Officer Leak who was talking with J.D. in his office. Perkins arrived in Officer Leak's office at some point during the phone conversation with Plaintiff's father. During the call with Plaintiff's father, Officer Leak confirmed that he had observed Q.W. and Plaintiff walking on campus earlier that morning. Officer Leak stated that Plaintiff was skipping class, despite her lack of disciplinary or truancy history at MPHS. This statement by Officer Leak discouraged Plaintiff's father from taking any further action to locate his daughter.

During the time that Officer Leak and Perkins were deciding whether to respond at all to the report of Plaintiff's abduction, Q.W. sexually assaulted Plaintiff. Around 7:50 a.m., Plaintiff informed her mother via text message of the sexual assault stating, "I was attacked." Her parents again contacted MPHS to demand that officials locate their daughter.

Officer Leak and Perkins ultimately began to investigate, locating Q.W. and Plaintiff outside of the woods. Plaintiff was distressed and disheveled. Her hair was in disarray, she had mud on her clothing, her glasses were broken, and there was semen on her shirt. Despite her obvious distress and with knowledge of an alleged abduction, Officer Leak directed Plaintiff to sit next to Q.W. in the back seat of his patrol vehicle. Plaintiff refused to do so. Officer Leak then

allowed Plaintiff to sit in the front seat next to him while Q.W. remained in the back seat with Perkins. Plaintiff was in shock and terrified of Q.W. who was seated directly behind her.

During the drive back to campus, Plaintiff sent text messages to J.D.'s cell phone in quick succession saying: "I was attacked," "I feel so gross," and "If I have aids ima [sic] kill myself." Unbeknownst to Plaintiff, Perkins had J.D.'s cell phone in his possession while in the back of the patrol vehicle with Q.W. Perkins received these text messages on J.D.'s cell phone and read them in real-time. Once back on campus, Perkins removed Q.W. from the patrol vehicle and took him to Officer Leak's office. Officer Leak then spoke with Plaintiff who confirmed that Q.W. had sexually assaulted her. Meanwhile, in Officer Leak's office, Q.W. claimed that he had consensual oral sex with Plaintiff. Despite having knowledge that Plaintiff had alleged both an abduction and a sexual assault, Perkins failed to ask Q.W. for any pertinent details. Instead, he accepted Q.W.'s version of events without conducting any further investigation. In his report, Perkins described the incident as "mutual sexual contact between two students." Perkins added in his report to CMS that Plaintiff's "clothes were not dirty, and her hair was not out of place."

Despite having knowledge that Plaintiff reported an abduction and sexual assault by Q.W., Officer Leak did not take a statement from Plaintiff, investigate her complaint, offer to transport her to a hospital, or assist her in making a report to the CMPD. Instead, Officer Leak filed a non-criminal report with the CMPD stating that two students skipped school without mentioning an abduction or sexual assault.

Plaintiff's father took her to Carolinas Health Care System for emergency medical attention and to preserve forensic evidence of the sexual assault with a rape kit. Officer Leak called Plaintiff's parents to inform them that he had filed a report and that there was no need for a

detective to go to the hospital. Plaintiff's parents and emergency room nurses called 911 a total of eight times, but no CMPD officer responded to take Plaintiff's statement or to collect the rape kit.

In the statement he prepared for CMS, Perkins omitted any reference to the attack, instead stating: "[Plaintiff] text[ed] that she feels gross and she better not have an STD." In an incident report he prepared on the morning of the assault, Perkins classified the "offense type" as "mutual sexual contact between two students," notwithstanding his knowledge that Plaintiff reported being "attacked" by Q.W. Perkins also reported in his statement to CMS that Plaintiff's "clothes were not dirty, and her hair was not out of place."

Plaintiff alleges that she transferred to another school, sought psychological care, and resigned her job, all as a result of the assault.

During the time at issue, Officer Leak and other CMS officials, including Perkins, had knowledge of sexual misconduct committed by male students against female students in the woods adjacent to the MPHS campus. One incident of sexual assault occurred on or about October 22, 2014. CMS received so many reports of alleged sexual misconduct in the woods that MPHS Principal Bosco convened a student assembly in the fall of 2015, before the events at issue here, to discuss the situation. At the assembly, Principal Bosco told the students "some people go into the woods and don't come back happy." He warned female students that MPHS could not protect them if they went into the woods, and told male students that "in these cases, you're guilty until proven innocent because that's just the price we pay for being men." CMS promulgated a school policy in its 2015-2016 Student Handbook which states: "Students may not leave campus without permission from an administrator, doing so will result in the student being considered truant." CMS had no Title IX coordinator or other employee designated to address complaints of sexual harassment.

On November 1, 2018, Plaintiff initiated this action alleging seven claims for relief. On June 5, 2019, several claims against CMS and Perkins were dismissed by the Court. Doe v. Putney, No. 3:18CV586-RJC-DSC, 2019 U.S. Dist. LEXIS 132703, at *23 (W.D.N.C. June 5, 2019). On February 20, 2020, the City of Charlotte and Chief Kerr Putney filed their Motion to Dismiss. Doc. 52. Counts III and VI are subject to this motion. Plaintiff brings claims against the City and Putney for failure to train under 42 U.S.C. 1983 as well as state law claims for negligent hiring, training, retention and supervision.

The City and Putney argue that Count III—the 42 U.S.C. § 1983 failure to train claim—should be dismissed because the allegations are duplicitous and Plaintiff has failed to allege sufficient facts that the municipality or Chief of Police were deliberately indifferent to Plaintiff's equal protection rights under the Fourteenth Amendment or her Title IX rights under 20 U.S.C. § 1681. The City and Putney further argue that Count VI—the state law negligent hiring, training, retention, and supervision claim—should be dismissed because Plaintiff has failed to allege sufficient facts that the City or Putney were on notice of Officer Leak's alleged incompetence.

## II. DISCUSSION

### A. Standard of Review

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). In resolving a motion for judgment on the pleadings, the court must accept all of the non-movant's factual averments as true and draw all reasonable inferences in its favor. Bradley v. Ramsey, 329 F. Supp. 2d 617, 622 (W.D.N.C. 2004). Judgment on the pleadings is warranted where the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Id. The court may consider the complaint, answer, and any materials attached to

those pleadings or motions for judgment on the pleadings "so long as they are integral to the complaint and authentic." Philips v. Pitt Cty. Mem. Hosp., 572 F.3d 176, 180 (4th Cir. 2009); see also Fed. R. Civ. P. 10(c) (stating that "an exhibit to a pleading is part of the pleading for all purposes."). Unlike a Rule 12(b)(6) motion, the court may consider the answer as well on a Rule 12(c) motion. Alexander v. City of Greensboro, 801 F. Supp. 2d 429, 433 (M.D.N.C. 2011).

Although a motion for judgment on the pleadings pursuant to Rule 12(c) is separate and distinct from a motion to dismiss under Rule 12(b)(6), federal courts apply the same standard for Rule 12(c) motions as for motions made pursuant to Rule 12(b)(6). Indep. News, Inc. v. City of Charlotte, 568 F.3d 148, 154 (4th Cir. 2009); Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405-06 (4th Cir. 2002); Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999).

In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Priority Auto Grp., Inc. v. Ford Motor Co., 757 F.3d 137, 139 (4th Cir. 2014). The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563. A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570); see also Robinson v. American Honda Motor Co., Inc., 551 F.3d 218, 222 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In Iqbal, the Supreme Court articulated a two-step process for determining whether a complaint meets this plausibility standard. First, the court identifies allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555) (alleging that government officials adopted a challenged policy "because of" its adverse effects on the protected group was conclusory and not assumed to be true). Although the pleading requirements stated in "Rule 8 [of the Federal Rules of Civil Procedure] mark [] a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678-79.

In Iqbal, the Court determined that Rule 8 "demands more than an unadorned, the defendant-unlawfully-harmed-me-accusation." Id. at 678. This "plausibility standard" requires "more than a sheer possibility that a defendant has acted unlawfully." Id. Thus, a complaint falls short of the plausibility standard where a plaintiff pleads "facts that are 'merely consistent with' a defendant's liability . . ." Id.; see also Eastern Shore Mkt.'s Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 175, 180 (4th Cir. 2000) (explaining that while the court accepts plausible factual allegations made in a claim as true and considers those facts in the light most favorable to plaintiff in ruling on a motion to dismiss, a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.").

Second, to the extent there are well-pleaded factual allegations, the court should assume their truth and then determine whether they plausibly give rise to an entitlement to relief. Iqbal at 679. "Determining whether a complaint contains sufficient facts to state a plausible claim for relief "will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief,'" and therefore should be dismissed. Id. (quoting Fed. R. Civ. P. 8(a)(2)).

The sufficiency of the factual allegations aside, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." Sons of Confederate Veterans v. City of Lexington, 722 F.3d 224, 228 (4th Cir. 2013) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)). Indeed, where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed." Neitzke, 490 U.S. at 328; see also Stratton v. Mecklenburg Cnty. Dept. of Soc. Servs., 521 Fed. Appx. 278, 293 (4th Cir. 2013)). The court must not "accept as true a legal conclusion couched as a factual allegation." Anand v. Ocwen Loan Servicing, LLC, 754 F.3d 195, 198 (4th Cir. 2014).

**B. Duplicity**

A 42 U.S.C. § 1983 claim against a government actor in an official capacity is "only another way of pleading an action against an entity of which an officer is an agent." Ky. v. Graham, 473 U.S. 159, 165-66 (1985). In North Carolina, city governments are the employers of police officers. N.C. Gen. Stat. § 160A-281. Police officers on public school campuses are

supervised by the Chief of Police. Id. at § 160A-288.4(b). The Chief of Police is, in turn, employed by the City of Charlotte. Charlotte, N.C., Municipal Code § 16-26.

Therefore, the 42 U.S.C. § 1983 claims brought against Putney are duplicative of the claims brought against the City and subject to dismissal. See Ridpath v. Bd. Of Governors Marshall Univ., 447 F.3d 292, 307 n.13 (4th Cir. 2006) (holding that official capacity claims against university administrators were duplicative of claims against its Board of Governors and subject to dismissal); Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004) (holding that official capacity § 1983 claims against school superintendent were duplicative of claims against the school board and subject to dismissal). Accordingly, the undersigned respectfully recommends that Plaintiffs' § 1983 claims against Putney be dismissed.

C. **Count III: 42 U.S.C. § 1983 Failure to Train**

Plaintiff asserts two 42 U.S.C. § 1983 claims against the City and Putney for failure to train. "A municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under § 1983." City of Canton v. Harris, 489 U.S. 378, 385 (1989) (citing Monell v. Dept. of Soc. Servs., 436 U.S. 658, 694-95 (1978)); see also Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999). A plaintiff seeking to impose liability on a municipality for the underlying constitutional or federal law torts of its employees under § 1983 must prove that some municipal "policy" or "custom" caused a deprivation of the plaintiff's rights. Monell, 436 U.S. at 694.

The Fourth Circuit has long recognized Monell and its progeny as requiring the plaintiff to adequately plead and prove the existence of an official policy or custom that proximately caused a deprivation of rights. Walker v. Prince George's Cty., 575 F.3d 426, 431 (4th Cir. 2009). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting

from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." Bd. Of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403-04 (1997) (citing Monell, 436 U.S. at 694). The Plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Id. at 404.

"Where a Plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Id. at 405; see also Harris, 489 U.S. at 391-92.

In Buffington v. Baltimore County., 913 F.2d 113 (4th Cir. 1990), the Fourth Circuit established that an employer's normal practice must be insufficient to prevent the injury for a § 1983 claim to succeed. Id. at 117. In Buffington, a suicidal detainee was placed in a holding cell and later hung himself. Id. The normal practice was to handcuff suicidal detainees by the booking desk so they "could be observed by the desk officers." The claims for municipal liability failed since the normal practice was sufficient to prevent suicide by a detainee. Id.

In Carter v. Morris, 164 F.3d 215 (4th Cir. 1999), the Fourth Circuit found that omissions by policymaking officials "that manifest deliberate indifference to the rights of the citizens" may constitute an "official policy or custom" giving rise to municipal liability. Id. at 218 (quotations and citations omitted). Deliberate indifference is established where policymakers have actual notice and acquiesce in a pattern of similar constitutional violations. Id. at 220.

A similar incident to the present case occurred on October 22, 2014. Plaintiff also alleges that there were other incidents of sexual misconduct that occurred leading to Principal Bosco's assembly in the fall of 2015.

The allegations in Plaintiff's First Amended Complaint do not support a § 1983 claim against the City. Plaintiff has not alleged deliberate indifference by the City through a policy or custom. Plaintiff's specific reference to a previous incident does not show a policy or custom. Plaintiff has failed to plead, other than conclusions, that the City had actual notice of and acquiescence in a pattern of similar constitutional violations. Carter v. Morris, 164 F.3d 215, 220 (4th Cir. 1999). The normal policy and custom for investigating reports of abduction and sexual assault would have been sufficient to prevent the injury. Buffington v. Baltimore Cty., 913 F.2d 113, 117 (4th Cir. 1990). For those reasons, the undersigned respectfully recommends that the Motion to Dismiss Plaintiff's § 1983 claim against the City be granted.

Since Plaintiff has failed to allege facts for the § 1983 claim to survive a 12(b)(6) motion to dismiss, it is unnecessary for the Court to address the underlying Fourteenth Amendment and Title IX claims against City.

   D. **Count VI: Negligent Hiring, Training, Retention and Supervision**

To establish a state law negligent hiring, training, retention, and supervision claim in North Carolina, a plaintiff must allege:

> (1) the specific negligent act . . . , (2) incompetence, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred, (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight or supervision, and (4) that the injury complained of resulted from the incompetency proved

Medlin v. Bass, 398 S.E.2d 460, 462 (N.C. 1990) (quoting Walters v. Lumber Co., 163 N.C. 536, 541 (1913).

Officer Leak was SSRO at MPHS. He failed to intervene following multiple reports of Plaintiff's abduction and sexual assault. He did not transport Plaintiff to the hospital or make a report of the abduction and sexual assault. Instead, Officer Leak accepted Q.W.'s version of the incident without further investigation. As a result of Officer Leak's actions, Plaintiff suffered a sexual assault and emotional distress.

Taking all reasonable inferences in favor of the Plaintiff, she has alleged sufficient facts to support her negligent hiring, training, retention and supervision claim. Based upon Plaintiff's allegations, this Court can infer that Officer Leak acted negligently in responding to the reports of her abduction and sexual assault. Furthermore, Officer Leak's incompetence can be inferred from his prior handling of a similar incident that occurred on October 22, 2014. Plaintiff has alleged sufficient facts that Defendants City and Putney had constructive notice of Officer Leak's incompetence. By following ordinary care and supervision of Officer Leak, they should have known of the previous incidents of sexual assault occurring in the woods by MPHS. Finally, Plaintiff has sufficiently alleged that her injuries were a direct result of Officer Leak's incompetence in handling reports of sexual assaults at MPHS.

For those reasons, the undersigned respectfully recommends that the Motion to Dismiss Plaintiff's Negligent Hiring, Training, Retention and Supervision claim against the City and Putney be denied.

### III.  ORDER

IT IS ORDERED that Plaintiff's requests for oral argument and leave to file a second amended complaint are denied. Plaintiff did not make a separate motion for leave to file a second amended complaint in violation of Local Rule 16.1(A).

## IV.  RECOMMENDATION

FOR THE FOREGOING REASONS, the undersigned respectfully recommends that "Defendants City of Charlotte and Kerr Putney's Motion to Dismiss," Doc. 52, be **GRANTED IN PART** and **DENIED IN PART**; that is, **GRANTED** as to the 42 U.S.C. § 1983 claims against the City and Putney and **DENIED** as to the state law negligent hiring, training, retention, and supervision claims against the City and Putney.

## V.  NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within fourteen days after service of same.  Failure to file objections to this Memorandum with the District Court constitutes a waiver of the right to de novo review by the District Judge. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989). Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140, 147 (1985); Diamond, 416 F.3d at 316; Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Wells, 109 F.3d at 201; Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties and to the Honorable Robert J. Conrad, Jr..

**SO ORDERED**.

Signed: May 29, 2020

David S. Cayer
United States Magistrate Judge