# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### 3:18-cv-00586-RJC-DSC

JANE DOE,                                              )
                                                       )
      Plaintiff,                                   )
                                                       )
      v.                                          )
                                                       )                    __Order__
KERR PUTNEY, CITY OF CHARLOTTE,                        )
CHARLOTTE MECKLENBURG BOARD OF                         )
EDUCATION, ANTHONY PERKINS, and                        )
BRADLEY LEAK,                                          )
                                                       )
      Defendants.                                  )

      **THIS MATTER** comes before the Court on Defendants City of Charlotte and Kerr Putney's Motion for Summary Judgment (Doc. No. 63), Defendants Charlotte Mecklenburg Board of Education and Anthony Perkins' Motion for Summary Judgment (Doc. No. 66), Defendant Bradley Leak's Motion for Summary Judgment (Doc. No. 67), Plaintiff's Rule 56(d) Motion (Doc. No. 92), Plaintiff's Motion to Compel Discovery by Defendants Board and Perkins and for Sanctions (Doc. No. 170), Plaintiff's Motion for Sanctions Against Defendants City of Charlotte & Kerr Putney (Doc. No. 177), the Magistrate Judge's Memorandum and Recommendation ("M&R") (Doc. No. 188), and the objections to the M&R (Doc. Nos. 190-191).

## I.    BACKGROUND

### A.  Factual Background

#### 1.   The Parties

      This case involves an alleged Myers Park High School ("MPHS") student-on-student kidnapping and sexual assault that occurred on November 3, 2015, and the events that transpired thereafter. On November 3, 2015, Plaintiff Jane Doe ("Plaintiff") was a junior at MPHS, under

the purview of Defendant Charlotte Mecklenburg Board of Education ("CMS").  (Doc. No. 16 ¶¶ 14-15, 20).  Q.W., the alleged assailant, was a senior at MPHS ("Q.W.").  (Doc. No. 74-2 at 3).  Defendant Anthony Perkins ("AP Perkins") was an assistant principal at MPHS.  (Doc. No. 16 ¶ 16).  Defendant Bradley Leak ("SRO Leak") was a full-time police officer of the Charlotte Mecklenburg Police Department ("CMPD"), assigned to MPHS as a school safety resource officer pursuant to a contract between CMS and the Defendant City of Charlotte (the "City").  (*Id.* ¶¶ 17-18).  Defendant Kerr Putney ("Putney") was the Chief of Police for CMPD.  (*Id.* ¶ 19).

By the fall 2015, CMS, MPHS, and administrators were aware of alleged student-on-student sexual assaults occurring on the MPHS campus and/or in wooded areas near campus.  For example, in 2014, students informed MPHS school administrators, including SRO Leak, of two different alleged sexual assaults that occurred in the woods near campus, and for which no criminal or disciplinary action occurred.  (Doc. No. 150-1; Doc. No. 150-2; Doc. No. 150-4).  Additionally, early in the fall 2015 semester, MPHS Principal Bosco ("Principal Bosco") held an assembly for students at which he warned female students about going into the woods with male students where "MPHS officials 'could not protect them.'"  (Doc. No. 150-4 ¶ 14).

2.  The November 3, 2015 Incident

a.  *The alleged kidnapping*

During the fall 2015 school year, Plaintiff and Q.W. shared a class together, and began exchanging text messages on October 29, 2015.[1]  (Doc. No. 81-28 at 23:2-3, 26:9-22).  On the

---

[1] All parties cite to different text messages that Plaintiff and Q.W. exchanged between October 29, 2015 and November 3, 2015, wherein Plaintiff and Q.W. had various discussions.  The parties direct the Court to different portions of the text messages over multiple days to imply Plaintiff was or was not romantically interested in Q.W. and why Plaintiff did or did not plan to or want to skip school with Q.W.  At different times, and based on tone and context, a reasonable juror could consider each of the parties' interpretations accurate.

morning of November 3, 2015, Q.W. asked Plaintiff by text message to skip school with him multiple times and Plaintiff declined. (Doc. No. 81-36; Doc. No. 75-3 at 58-68). Ultimately, just before 7:00 AM, Plaintiff provided Q.W. with her location in the LA building at MPHS, where Q.W. met her. (Doc. No. 71-3 at 49:16-50:2). According to Plaintiff, she again rejected Q.W.'s request to skip class, and Plaintiff left with Q.W. to walk her to class. (Doc. No. 71-3 at 54:22-55:2). They did not take a direct route to her class, but "looped around" near the back entrance of MPHS. (Doc. No. 71-3 at 49:16-50:2).

At that time, around 7:00 AM, SRO Leak was directing traffic at the back entrance of MPHS when he observed Plaintiff and Q.W. walking away from the school. (Doc. No. 71-2 at 175:6-11). He recognized Plaintiff and called out to her, "I see you. As soon as I finish here I'm going to call your mother." (*Id.*). According to SRO Leak, after he called out to her, Plaintiff and Q.W. turned around and walked back towards the school. (Doc. No. 71-2 at 175:12-176:21). According to Plaintiff, at that time Q.W. grabbed her wrist and pulled her into the woods while warning her not to make a scene. (Doc. No. 81-39 at 64:15-24). Defendants contend SRO Leak did not see Q.W. grab Plaintiff's wrist or speak to her nor that Plaintiff appeared in distress or indicated to SRO Leak that she needed help. (Doc. No. 75-1 at 19; Doc. No. 71-2 at 201:8-202:8).[2]

### b. *Plaintiff reported a kidnapping*

At 7:02 AM, Plaintiff began sending text messages to her friends stating, "I'm being kidnapped" and "Help me." (Doc. No. 75-4 at 9). At 7:18 AM, she sent similar text messages to her mother ("Mrs. Doe") stating, "Mom I'm being kidnapped." (Doc. No. 81-41 at 2). She

---

[2] Plaintiff asserts SRO Leak saw Q.W. grab her wrist. (Doc. No. 81 at 6 ¶ 10). However, when reviewing the evidence she points to for this assertion, including Plaintiff's deposition and a CMPD report, the evidence does not appear to support her contention that SRO Leak saw Q.W. grab Plaintiff's wrist and pull her into the woods.

3

continued sending text messages to her friends and mother, telling them to call the police and to report the kidnapping to SRO Leak.  (Doc. Nos. 75-4, 81-41).

During this time, Mrs. Doe informed Plaintiff's father ("Mr. Doe") of the alleged kidnapping.  (Doc. No. 81-42 at 62:13-74:9).  Simultaneously, Plaintiff's friend J.D. was excused from class to report the incident to SRO Leak.  (Doc. No. 83-13 at 5 ¶¶ 19-25).  Also at the same time, SRO Leak finished directing traffic and returned to his office to find Mrs. Doe's phone number.  (Doc. No. 71-2 at 209:2-5).  Before SRO Leak found Mrs. Doe's phone number, at some point before 7:26 AM, J.D. arrived at his office and told him that somebody kidnapped Plaintiff.  (Doc. No. 83-13 at 5 ¶¶ 19-25; Doc. No. 75-1 at 5:4-21).  According to SRO Leak, he thought Plaintiff went back to the school after he called out to her so he asked the MPHS front office to call Plaintiff's class and confirm that she was not in class.  (Doc. No. 71-2 at 220:14-221:4; Doc. No. 72-4 at 55:15-22).  Concurrently, Plaintiff's father ("Mr. Doe") called MPHS three times and spoke to SRO Leak to report that somebody kidnapped Plaintiff.[3]  (Doc. No. 72-4 at 55:4-22).

While in SRO Leak's office, J.D. did not believe SRO Leak took the situation seriously, and at 7:26 AM, J.D. sent Plaintiff a text message stating, "Their [sic] not believing her."  (Doc. No. 75-4 at 28; Doc. No. 83-3 at 6 ¶ 26).  During this time, Plaintiff exchanged additional text messages, including:

| Time | Text Message | Exchanged With[4] |
|---|---|---|
| 7:28 AM | Plaintiff: "Please i'm being serious" | Friends |
| 7:28 AM | J.D.: "Where are you" | Friends |
| 7:28 AM | Plaintiff: "Idk" | Friends |
| 7:28 AM | J.D.: "Seriously"<br>"Are you on campus" | Friends |

[3] According to Defendants, SRO Leak informed Mr. Doe he saw Plaintiff walking off campus with a male student and he was going to call her mom, to which Mr. Doe responded "well, maybe she's trying to make something up." (Doc. No. 66-6 at 228:8-24).  Plaintiff disputes that Mr. Doe said this.  (Doc. No. 81).
[4] Contents in table appear in Doc. No. 75-4 at 29-33 and Doc. No. 75-5 at 6-36.

| | | |
|---|---|---|
| | "He's calling your dad"<br>"He said he saw you" | |
| 7:29 AM | Plaintiff: "NO" | Friends |
| 7:29 AM | J.D.: "Where are you" | Friends |
| 7:29 AM | Plaintiff: "IDK WHERE WE ARE" | Friends |
| 7:30 AM | J.D.: Call me | Friends |
| 7:30 AM | Plaintiff: "They know I dont skip" | Friends |
| 7:30 AM | J.D.: "Are you in danger?" | Friends |
| 7:31 AM | Plaintiff: "No he's just talking"<br>Plaintiff: "Hassell street. I saw hassell street" | Friends |
| 7:31 AM | "Street sign says hassell" | Mother |
| 7:33 AM | "I think he's crazy"<br>"He's just talking" | Mother |
| 7:33 AM | J.D.: "[C]an you come back to the school" | Friends |
| 7:33 AM | Plaintiff: "I can't" | Friends |
| 7:33 AM | J.D.: "Why not" | Friends |
| 7:33 AM | Plaintiff: "Guys I'm being serious"<br>"I'm really scared"<br>"Nobody is helping" | Friends |
| 7:35 AM | J.D.: "[We're] comming [sic]" | Friends |
| 7:36 AM | J.D.: "He said he's coming for you" | Friends |
| 7:41 AM | "the police is coming [sic] just tell us where u r?" | Mother |

After Plaintiff mentioned Hassell Street, SRO Leak knew it was a route MPHS students took to the "bamboo forest."  (Doc. No. 75-1 at 6:17-7:3).  He understood students went to the bamboo forest "for two things, one to make out or one to fight, one or the other."  (*Id.*).

### c.  SRO Leak and AP Perkins responded to the kidnapping report

At some point while J.D. was in SRO Leak's office, SRO Leak informed AP Perkins of Plaintiff's alleged kidnapping.[5]  (Doc. No. 75-1 at 7:4-9; Doc. No. 72-5 ¶¶ 4-6).  After discussion, AP Perkins reported the alleged kidnapping to Principal Bosco, and then, SRO Leak and AP Perkins left the school in SRO Leak's patrol car to try to find Plaintiff.[6]  (Doc. No. 83-18 at 88:6-

---

[5] The evidence is not entirely clear on the exact time that AP Perkins was informed of the alleged kidnapping, and whether it occurred before or after Plaintiff provided the name of Hassell Street.
[6] Neither SRO Leak nor AP Perkins reported the alleged kidnapping to CMPD dispatch before beginning their search for Plaintiff.  Defendants assert since SRO Leak was on the MPHS campus, he could initiate the search for Plaintiff more quickly than a backup patrol officer.  The parties

91:20). AP Perkins took J.D.'s phone with him when he left the school. (Doc. No. 72-5 ¶ 9). The parties disagree on the exact timing that SRO Leak and AP Perkins left MPHS to search for Plaintiff. Plaintiff contends they left around, but not before, 7:57 AM, which was the timing of the last text message from J.D.'s phone before AP Perkins took her phone and left the school.[7] (Doc. No. 83-12 at 39). Defendants assert they left as soon as Plaintiff provided the name of Hassell Street because they had a location to try to find her. Defendants point to J.D.'s text messages at 7:35 AM and 7:36 AM, stating "he's coming for you" and Mrs. Doe's text message at 7:41 AM stating the police are coming.[8] (Doc. No. 75-5 at 36).

According to SRO Leak and AP Perkins, once they left MPHS, first they drove to Hassell Street, and also went to the nearby Chick-fil-A and the Circle K convenience store searching for Plaintiff and Q.W. (Doc. No. 72-5 ¶¶ 10-12; Doc. No. 66-6 at 244:1-245:24). Afterwards, they went to a parking lot near the bamboo forest, but did not go into the bamboo forest because SRO Leak did not believe anybody was in the bamboo forest since it was rainy and muddy. (Doc. No. 66-6 at 244:1-245:24). While in the parking lot, they located Plaintiff and Q.W. walking nearby. (Doc. No. 72-5 ¶¶ 10-12; Doc. No. 66-6 at 244:1-245:24; Doc. No. 83-12 at 42).

_____

dispute whether it was reasonable for SRO Leak and AP Perkins to begin searching for Plaintiff without reporting the alleged kidnapping to CMPD dispatch.

[7] The Court observes that Plaintiff's timeline that SRO Leak and AP Perkins left MPHS at or after 7:57 AM, hard to reconcile with Plaintiff's timeline that she was in SRO Leak's patrol car calling Mr. Doe by 8:02 AM.

[8] Defendants argue the timeline is not in dispute because Plaintiff's expert made a statement that he generally agreed with Defendants' expert's timeline, but this argument is unpersuasive because Plaintiff's expert did not make an unequivocal statement conceding to the accuracy, minute-by-minute of Defendants' expert's timeline. Rather, he clarified that he had not confirmed it was accurate minute-by-minute.

### d. Plaintiff was allegedly sexually assaulted in the bamboo forest

At some point as the events transpired at MPHS and elsewhere, while in the bamboo forest, Plaintiff alleges that Q.W. orally sexually assaulted her. (Doc. No. 81-28 at 9:2-13:1). During the alleged assault, according to Plaintiff, she became muddy and her glasses fell off her face and broke. (Doc. No. 81-28 at 9:2-13:1). After the assault, Plaintiff sent text messages to her mother and friends, including:

| Time | Text Message | Exchanged With[9] |
|------|-------------|------------------|
| 7:50 AM | "I wa[s] attacked" | Mother |
| 7:51 AM | "Idk where we are." | Mother |
| 8:00 AM | "He says he's walking me back to campus" | Mother |
| 8:05 AM | "I was attacked"<br>"I feel so gross"<br>"If I have aids ima kill myself" | Friends |
| 8:13 AM | "I'm in a cop car" | Friends |

AP Perkins saw these messages on J.D.'s phone while in SRO Leak's patrol car. (Doc. No. 72-11 at 7:18-8:9).

### e. The investigation

After searching for Plaintiff, SRO Leak and AP Perkins found Plaintiff and Q.W. walking nearby the bamboo forest. (Doc. No. 72-5 ¶¶ 10-12; Doc. No. 66-6 at 244:1-245:24; Doc. No. 83-12 at 42). According to AP Perkins and SRO Leak, when they found her, Plaintiff appeared normal, and she was not disheveled or muddy. (Doc. No. 72-5 ¶¶ 14, 16; Doc. No. 75-1 at 19:1-12). Plaintiff asserts she was muddy, her glasses were broken, and she had a white stain on her sweater from the assault. (Doc. No. 81-39 at 76:23-77:25). When they found her, Plaintiff mouthed "help" to AP Perkins. (Doc. No. 75-11 at 6).

---

[9] Contents in table appear in Doc. No. 74-8 at 8-10 and Doc. No. 83-12 at 40-42.

After locating Plaintiff, she got into the front seat of SRO Leak's patrol car with SRO Leak, and Q.W. got into the backseat of the patrol car with AP Perkins, separated by a partition. (Doc. No. 81-39 at 79:10-25; Doc. No. 75-1 at 7:18-8:5). While in the car, before reaching the school, SRO Leak asked Plaintiff questions about what occurred, but after Plaintiff expressed concern that Q.W. could hear her, SRO Leak stopped questioning Plaintiff. (Doc. No. 81-39 at 80:1-22; Doc. No. 75-1 at 7:18-8:11). SRO Leak also told Plaintiff to call Mr. Doe, which she did, according to Plaintiff, at 8:02 AM. (Doc. No. 81-39 at 80:1-22).

When they arrived back at MPHS, AP Perkins and Q.W. exited SRO Leak's patrol car. (Doc. No. 74-10 at 8:12-25; Doc. No. 71-3 at 82:2-5). AP Perkins spoke to Q.W. about the incident in the school who claimed the activity was consensual, while SRO Leak and Plaintiff remained in the car. (*Id.*). In the car, SRO Leak asked Plaintiff questions about what occurred with Q.W. for a brief time. (Doc. No. 74-10 at 8:12-25). The parties dispute whether Plaintiff reported that she was sexually assaulted to SRO Leak. According to Defendants, Plaintiff did not tell SRO Leak that she was sexually assaulted, and did not respond when he asked if she was sexually attacked. (Doc. No. 74-10 at 8:12-25). Plaintiff asserts that she reported that she was "attacked" and sexually assaulted to SRO Leak. (Doc. No. 81-28 at 14:3-19). The parties agree that Plaintiff reported Q.W. made her engage in oral sex, which she did not want to do or felt uncomfortable doing, and that she spit "his DNA all over" her sweater. (Doc. No. 74-10 at 8:6-25; Doc. No. 71-3 at 82:18-84:14). During this questioning, SRO Leak contacted his supervisor, Sergeant Smith, to seek guidance, who told him to contact Sergeant Hughes in the sexual assault unit. (Doc. No. 71-2 at 262:1-265:21).

SRO Leak questioned Plaintiff briefly before Mr. Doe arrived at MPHS, when SRO Leak took Plaintiff to see Mr. Doe. (Doc. No. 71-2 at 259:25-260:15). Mr. Doe described Plaintiff with

a sad and disassociated look, muddy, and with a stain on her sweater. (Doc. No. 81-46 at 66:18-67:4). According to Mr. Doe, SRO Leak asked Plaintiff if she was sure she wanted "to go with this" and that there would be "consequences" if she was not telling the truth. (Doc. No. 81-46 at 66:1-12). Plaintiff left the school with her parents and went to the hospital for an examination. (Doc. No. 81-46 at 74:14-22).

Afterward, SRO Leak called the school resource officer supervisor, Sergeant Ratliff to inform her of the incident. (Doc. No. 71-2 at 266:1-19). He also called Sergeant Hughes in the CMPD sexual assault unit. (*Id.*). During his call with Sergeant Hughes, SRO Leak relayed information about the incident, and based on that information, Sergeant Hughes opined that if Plaintiff felt uncomfortable with the activity but engaged in the sexual activity nevertheless then there was not "force" and a sexual assault did not occur. (Doc. No. 81-63 at 4:16-6:5). Next, SRO Leak spoke to CMPD Detective Banner, who reported to Sergeant Hughes in the sexual assault unit, and based on the information SRO Leak conveyed, Detective Banner told SRO Leak the same.[10] (Doc. No. 75-9 at 3:1-8:19). Detective Banner and another detective in the sexual assault unit, Detective Clark, responded to MPHS to investigate the incident. (Doc. No. 75-9 at 8-25). They spoke to Q.W. who claimed the encounter was consensual and reviewed video footage. (*Id.*). AP Perkins reviewed security camera footage and spoke with J.D., the CMPD officers, and Q.W. who told him the interaction was consensual, but he did not speak with or interview Plaintiff. (Doc. No. 72-5 ¶¶ 20-29).

---

[10] According to Detective Banner, she asked SRO Leak whether Q.W. threatened Plaintiff or used force and SRO Leak responded no, only that she felt uncomfortable saying no to Q.W.'s advances. (Doc. No. 75-9 at 3:1-8:19). According to Banner, SRO Leak also said "I kind of think all of this is because she knew I was going to call the parent." (Doc. No. 75-9 at 8:15-19).

*f. Plaintiff's hospital visit*

After leaving MPHS, Plaintiff went to the hospital, where she underwent a Sexual Assault Nurse Examination ("SANE"). She reported the incident to the SANE nurse, who found her report credible. (Doc. No. 82-52 ¶ 10). CMPD did not go to the hospital in response to the bedside nurse's call reporting the alleged sexual assault. (Doc. No. 82-52 ¶¶ 14-15). When CMPD did not respond, the SANE nurse personally called CMPD and was informed a CMPD officer would be responding. (Doc. No. 82-52 ¶¶ 14-15). Nobody from CMPD responded to the hospital in response to the allegations and the SANE nurse's request or otherwise. (Doc. No. 82-52 ¶¶ 15-16). According to the SANE nurse, this was highly unusual because in her experience CMPD always responds to allegations of sexual assault at the hospital for a statement, even when the reports are not credible. (Doc. No. 82-52 ¶ 17). According to SRO Leak, when Plaintiff initially left MPHS to go to the hospital he called Mrs. Doe to go to the hospital but she did not want him there. (Doc. No. 71-2 at 272:17-273:1). According to records, at some point Detective Banner collected the sexual assault kit from the hospital. (Doc. No. 82-34 at 13, 17).

### 3. Response Following the November 3, 2015 Incident

After the November 3 incident, MPHS removed Q.W. from the classes and lunch period he shared with Plaintiff and suspended him for 10 days pending the outcome of CMS' investigation. (Doc. No. 72-5 ¶¶ 23, 25, 43). The 10-day suspension ended after four out-of-school days due to CMS' ultimate conclusion that a sexual assault did not occur. (*Id.* ¶¶ 38, 43). MPHS was prepared to provide Plaintiff with counseling if she returned to the school but, at Mrs. Doe's request, instead CMS facilitated Plaintiff's transfer from MPHS to another CMS high school. (*Id.* ¶ 43).

On November 3, 2015, AP Perkins created an initial Incident Reporting Form giving a preliminary summary of the incident. (Doc. No. 72-5 ¶¶ 26-27). He or another MPHS employee gave the CMS Central Learning Community a summary of the incident, including that evidence suggested the incident might have been consensual but that the investigation was ongoing. (*Id.*). AP Perkins did not mention a kidnapping and CMS did not report any kidnappings at MPHS for the 2015-2016 school year. (*Id.*; Doc. No. 83-40). Also on November 3, 2015, SRO Leak made an initial incident report, categorizing the incident as "Miscellaneous non-Criminal / Other Unlisted Non-Criminal Incident – truancy." (Doc. No. 82-34 at 2-6). SRO Leak's initial incident report included a one sentence description of the incident stating: "On 11/3/2015 at 0700 hours the reporting person saw the witnesses skipping class at [MPHS]." (*Id.*). Later, SRO Leak provided a longer description of the incident, mentioning that J.D. reported her friend missing and in trouble, but did not state that J.D. reported a kidnapping. (*Id.* at 7-8). It also included a description of what SRO Leak alleges Plaintiff told him in his patrol car. (*Id.*).

On November 4, 2015, Mrs. Doe filed a complaint with CMPD Internal Affairs ("CMPD IA") alleging that SRO Leak falsified his report regarding the November 3, 2015 incident. (Doc. No. 75-11 at 1). According to the CMPD IA report, Plaintiff claimed she did not speak to SRO Leak and he made up what she said in his report of the incident. (*Id.*). Following an investigation, Mrs. Doe's complaint against SRO Leak was disposed of as unfounded. (Doc. No. 75-13). Also on November 4, 2015, without speaking to Plaintiff, AP Perkins informed Principal Bosco and others in the CMS Central Learning Community that the investigation was coming to an end and he will change the incident to "consensual sexual activity," because all the evidence pointed to the incident being consensual. (Doc. No. 83-50). He wondered, "what I should do with the girl. Her mother is saying one thing, all the evidence is pointing to consensual." (*Id.*). On November 6,

2015, Mrs. Doe sent an email to MPHS administrators stating that "[w]e will not discuss any specifics about the events that took place . . . or do not want to be informed of any outcomes of the school investigation." (Doc. No. 72-5 at 52). On November 9, 2015, without speaking to Plaintiff, MPHS changed the coding of the incident in PowerSchool from "Sexual Offense" to "Mutual Sexual Contact." (*Id.* ¶ 37). Based on this, Q.W.'s 10-day suspension ended. (*Id.* ¶ 38). In April 2016, Plaintiff and her parents requested CMS implement a no-trespass and no contact order against Q.W. at her new high school, which CMS indicated it was unable to do. (Doc. No. 72-3 at 590-91).

In May 2016, Plaintiff and her parents filed a complaint with the U.S. Department of Education Office of Civil Rights ("OCR") regarding the November 3, 2015 incident. (Doc. No. 72-5 at 85). The OCR completed its investigation in 2017, concluding CMS conducted a prompt, thorough, and impartial investigation of the November 3, 2015 incident, but found that it failed to provide adequate notice to both parties of the outcome of the investigation which CMS agreed to resolve through a resolution agreement. (Doc. No. 72-5 ¶ 47, pp. 85-100). The OCR identified other concerns regarding the response to the November 3 incident, including CMS' failure to adequately document the investigation, failure to identify the standard of evidence used in making its determination, and the lack of any involvement or oversight from a Title IX coordinator, but the OCR noted that these issues were resolved through a prior resolution agreement. (Doc. No. 72-5 at 97).

### B.  Procedural Background

Thereafter, on November 1, 2018, Plaintiff filed this action. (Doc. No. 1). Defendants filed motions to dismiss which were each granted in part on recommendations from the Magistrate Judge. (Doc. Nos. 39, 42, 57, 58). Following partial dismissal, Plaintiff's remaining claim are:

(1) violation of Title IX against CMS; (2) section 1983 equal protection claim for deliberate indifference of student-on-student sexual harassment against SRO Leak and AP Perkins; (3) negligence against SRO Leak and AP Perkins; (4) negligent infliction of emotional distress against SRO Leak and AP Perkins; (5) common law obstruction of justice against SRO Leak and AP Perkins; (6) and negligent hiring training, retention, and supervision against the City and Putney.

After discovery, on October 26, 2020, Defendants filed their Motions for Summary Judgment. (Doc. Nos. 63, 66, 67). In August 2021, Plaintiff filed a motion under Federal Rule of Civil Procedure 56(d), requesting the Court deny Defendants' Motions for Summary Judgment, grant additional discovery, and for sanctions related to alleged withholding of or misrepresentations regarding the history of sexual assaults at MPHS in light of media reports of additional sexual assaults at MPHS. (Doc. No. 92). The Magistrate Judge granted, which this Court almost entirely adopted, Plaintiff's request for additional discovery, re-opened the discovery period for a short time, and granted leave for all parties to file supplemental briefs in support of or in opposition to the Motions for Summary Judgment. (Doc. Nos. 103, 126). Plaintiff's Rule 56(d) motion was otherwise denied without prejudice subject to renewal following the extended discovery period. (Doc. No. 103, 126). The Court heard arguments on Defendants' Motions for Summary Judgment on April 20, 2022. At the hearing, Plaintiff renewed her Rule 56(d) motion, requesting that the Court deny the Motions for Summary Judgment and for sanctions.

After the hearing, the Plaintiff filed two additional motions requesting the Court compel discovery and sanction the Defendants. First, Plaintiff filed a Motion to Compel Discovery by Defendants CMS and AP Perkins and for Sanctions (the "CMS Sanction Motion"). The CMS Sanction Motion asserted that CMS and AP Perkins produced 211 pages of responsive discovery the day before the summary judgment hearing and still had not produced all responsive documents.

(Doc. No. 170). Next, the Plaintiff filed a Motion for Sanctions against Defendants City and Putney (the "City Sanction Motion"), claiming the City and Putney withheld responsive documents and information until after the supplemental briefing and summary judgment hearing. (Doc. No. 177). Plaintiff requested sanctions in the form of a default judgment and attorneys' fees.

When considering the CMS Sanction Motion and the City Sanction Motion, the Magistrate Judge observed that the Court entered three Orders requiring the relevant Defendants to comply with their discovery obligations, but Defendants did not comply nor did they provide a sufficient explanation for not complying. (Doc. No. 188). The Magistrate Judge concluded, "[i]n light of Defendants' egregious non-compliance and considering the present posture of the case . . . additional sanctions are appropriate" but that a default judgment would be too severe. (*Id.* at 3). Accordingly, the M&R recommended awarding Plaintiff costs, including reasonable attorney's fees incurred in preparation of the discovery motions, and striking CMS and AP Perkins' Motion for Summary Judgment and the City and Putney's Motion for Summary Judgment. (*Id.*). The Defendants objected. (Doc. Nos. 190-191).

## II.   STANDARD OF REVIEW

### A.  M&R

A district court may assign dispositive pretrial matters, to a magistrate judge for "proposed findings of fact and recommendations." 28 U.S.C. § 636(b)(1)(A) & (B). A district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). A district court also may assign nondispositive pretrial matters to a magistrate judge to "hear and determine." 28 U.S.C. § 636(b)(1)(A). When reviewing an objection to a magistrate judge's order on a nondispositive matter, the district court must set aside or modify any portion of that order

which is clearly erroneous or contrary to law. *Id.*; Fed. R. Civ. P. 72(a). "Under this standard, a finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Gentry v. Maggie Valley Resort Management, LLC*, 2014 WL 12707371, at *1 (W.D.N.C. Apr. 4, 2014) (quoting *United States v. U.S. Nat'l Gypsum Co.*, 333 U.S. 364 (1948)). "Courts have consistently found discovery motions to be nondispositive." *Federal Election Commission v. Christian Coalition*, 178 F.R.D. 456, 459 (E.D. Va. 1998); *Gupta v. Freddie Mac*, 823 Fed. App'x 225, 226 (4th Cir. 2020).

### B. Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.* The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings

15

to defeat a motion for summary judgment. *Id.* at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249-50.

## III.  DISCUSSION

### A.  The M&R

The Magistrate Judge recommended sanctioning Defendants CMS, AP Perkins, the City, and Putney (the "Sanctioned Defendants") by awarding Plaintiff fees and costs in preparation of the CMS Sanction Motion and the City Sanction Motion, and striking the Sanctioned Defendants' motions for summary judgment. (Doc. No. 188). The Sanctioned Defendants object to the M&R on various grounds. (Doc. Nos. 190-191).

First, AP Perkins argues that the Magistrate Judge erred because he is not a CMS employee, has no responsive documents, and is not a party to CMS' document production thus requiring him to produce documents and sanctioning him is not appropriate. Based on AP Perkins' representation that he has no responsive documents and because the Plaintiff withdrew the CMS

16

Sanction Motion against AP Perkins specifically, the Court declines to adopt the M&R's recommendations as to AP Perkins. (Doc. No. 181 at 4 n.2). The Court will not compel AP Perkins to produce documents or otherwise sanction AP Perkins at this time.

Next, the Sanctioned Defendants[11] raise numerous specific objections to the M&R, the thrust of which overall argue that the Magistrate Judge did not properly consider caselaw and the entire record in this case when awarding sanctions. Pursuant to Federal Rule of Civil Procedure 37(b), the court may, in its discretion, sanction a party that "fails to obey an order to provide or permit discovery," including by striking pleadings and awarding costs and fees. Fed. R. Civ. P. 37(b); *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 347-48 (4th Cir. 2001). Courts consider four-factors when imposing sanctions under Rule 37(b): "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Id.* at 348.

Here, the Sanctioned Defendants failed to "obey an order to provide or permit discovery" when they failed to fully comply with the initial Orders granting Plaintiff's Rule 56(d) motion and then failed to fully comply with the Magistrate Judge's Order compelling discovery. (Doc. No. 103; Doc. No. 126; Doc. No. 137). First, the Sanctioned Defendants argue they did not act in bad faith. However, the Sanctioned Defendants fail to recognize that the Court allowed additional discovery only because Plaintiff credibly asserted the Defendants withheld responsive discovery. (Doc. No. 103 at 2). Even after such a finding, the Sanctioned Defendants failed to fully comply with their discovery responsibilities. And despite the Court's conclusions otherwise, they continue

---

[11] Hereinafter, references to Sanctioned Defendants refers to all Sanctioned Defendants except AP Perkins.

to argue they should not be held responsible because the discovery they withheld and/or untimely produced is not relevant to Plaintiff's claims or is not responsive. Given the record as a whole in this case, the Court concludes there is sufficient evidence to show the Sanctioned Defendants acted in bad faith. Next, the Defendants continue to argue that they did not prejudice Plaintiff by failing to comply with their discovery obligations. The Court disagrees. In granting Plaintiff's Rule 56(d) motion for additional discovery, the Court inherently concluded such information is relevant to Plaintiff's ability to oppose the summary judgment motions. Despite this, Plaintiff neither received all of the responsive discovery prior to the supplemental summary judgment briefing deadline nor before the summary judgment hearing. Plaintiff was prejudiced because she was unable to review and analyze all responsive discovery she requested before important Court deadlines when opposing the summary judgment motions. Finally, given the entire record in this case the Court finds sanctions are necessary to deter additional non-compliance with the Court's Orders in this case and others. The Court is frankly tired of Defendants' gamesmanship in discovery.

Notwithstanding, the Court assesses that Plaintiff was able to effectively oppose the Sanctioned Defendants' motions for summary judgment. Therefore, the Court will not strike the Sanctioned Defendants' motions for summary judgment. However, Plaintiff is awarded costs and attorneys' fees in connection with preparing the CMS Sanction Motion and the City Sanction Motion. The Court otherwise adopts the M&R.

### B. CMS' Motion for Summary Judgment

Plaintiff's remaining claim against CMS alleges it violated Title IX by its deliberate indifference to student-on-student sexual harassment. "Title IX provides: 'No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial

assistance.'" *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263 (4th Cir. 2021) (quoting 20 U.S.C. § 1681(a)). "It is well-settled that sexual harassment qualifies as discrimination under Title IX, and, in the school context, student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination." *Miller v. Union Cnty. Pub. Schs.*, No. 3:16-cv-00666-FDW-DCK, 2017 WL 3923977, at *4 (W.D.N.C. Sept. 7, 2017).

> To establish a Title IX claim based on student-on-student sexual harassment, a plaintiff must show that: (1) [she was] a student at an educational institution receiving federal funds; (2) [she] suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived [her] of equal access to the educational opportunities or benefits provided by [her] school; (3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and (4) the school acted with deliberate indifference to the alleged harassment.

*Fairfax Cnty. Sch. Bd.*, 1 F.4th at 263-64.

First, it is undisputed that Plaintiff was a student at MPHS and that CMS and MPHS receive federal funding from the U.S. Department of Education. (Doc. No. 16 ¶ 15; Doc. No. 23 ¶ 15). Next, CMS argues Plaintiff cannot show that she suffered sexual harassment so severe, pervasive, and objectively offensive for her Title IX claim because CMS' investigation concluded that Plaintiff was not sexually assaulted. However, CMS' conclusion on this issue is not determinative of whether sexual harassment occurred. Rather, "the main object of inquiry for this prong is the alleged sexual harassment, rather than the defendant's response thereto." *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 274-75. In assessing this prong, "the factfinder must consider all of the surrounding circumstances and use common sense and an appropriate sensitivity to social context to identify objectively hostile or abusive conduct." *Id.* Plaintiff submitted evidence sufficient to create questions of fact as to whether she was kidnapped and sexually assaulted.

Next, under the third, notice, prong "[a] school's receipt of a report or complaint alleging sexual harassment is sufficient to establish actual notice under Title IX." *Id.* at 268. "This is an objective inquiry which asks whether an appropriate official in fact received such a report or complaint and whether a reasonable official would construe it as alleging misconduct prohibited by Title IX" this is "regardless of whether school officials subjectively understood the report to allege sexual harassment or whether they believed the alleged harassment actually occurred." *Id.* at 263, 268. CMS' Motion does not appear to contest that it had actual notice or knowledge of the alleged sexual assault. In any event, Plaintiff presented sufficient evidence in the form of text messages, deposition testimony, and declarations that CMS, through AP Perkins and SRO Leak, had actual notice of an alleged kidnapping and sexual assault sufficient for the jury to determine whether CMS was on notice of the alleged sexual assault.

Last, CMS argues it did not act with deliberate indifference as required by the fourth prong of a Title IX claim. A "school acts with deliberate indifference where its response to the [alleged] harassment or [the] lack [of any such response] is clearly unreasonable in light of the known circumstances." *Id.* at 269. "While deliberate indifference is a high standard that requires more than a showing of mere negligence, half-hearted investigation or remedial action will [not] suffice to shield a school from liability." *Id.* Additionally, in the Fourth Circuit, "a school may be held liable under Title IX if its response to a single incident of severe sexual harassment, or the lack thereof, was clearly unreasonable and thereby made the plaintiff more vulnerable to future harassment or further contributed to the deprivation of the plaintiff's access to educational opportunities." *Id.* at 273.

CMS argues that it did not act with deliberate indifference upon receiving notice of the November 3, 2015 incident, pointing to (1) what it asserts was AP Perkins' immediate search for

20

Plaintiff upon learning of the kidnapping report; (2) AP Perkins inability to obtain a statement from Plaintiff due to her parents taking her to the hospital; (3) AP Perkins' investigation, which included speaking to Q.W., J.D., and reviewing video footage; (4) CMS' response to the incident including removing Q.W. from Plaintiffs' classes, a suspension pending the outcome of the investigation (which was shortened upon the conclusion of CMS' investigation), planning for school counseling before Plaintiff transferred schools, offering to collect Plaintiff's work while she was out, and a fast-tracked transfer to another high school; and (5) AP Perkins' participation in the CMPD investigation.  CMS argues this response, as a matter of law, was not deliberate indifference.  CMS cites to cases indicating a school is not deliberately indifferent as a matter of law because of mere negligence in addressing sexual assault allegations, not providing the remedy desired by the victim, or not taking "heroic" measures and performing flawless investigations.  *See Facchetti v. Bridgewater Coll.*, 175 F. Supp. 3d 627, 638 (W.D. Va. 2016); *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 174, *rev'd on other grounds*, 555 U. S. 256 (2009); *Doe v. Bd. of Educ. of Prince George's Cty.*, 605 Fed. App's 159, 167-168 (4th Cir. 2015) (per curiam).

However, as the Fourth Circuit in *Fairfax County* recently explained, while mere negligence is not enough to create liability, a "half-hearted investigation or remedial action will [not] suffice to shield a school from liability."  *Doe*, 1 F.4th at 274-75.  Plaintiff points to evidence that creates questions of fact as to whether CMS acted with deliberate indifference, or clearly unreasonable, with respect to the November 3, 2015 incident and thereafter.  Plaintiff argues SRO Leak and AP Perkins were clearly unreasonable under the circumstances (1) in responding to Plaintiff's alleged kidnapping, including failing to alert CMPD immediately, initially not taking the reports of kidnapping seriously, and not going into the bamboo forest to search for Plaintiff; (2) in investigating Plaintiff's alleged sexual assault, including SRO Leak's threats to Plaintiff for

making "false" allegations, early assumptions that Plaintiff made up the alleged kidnapping to avoid getting in trouble for skipping class, AP Perkins' report of the incident not mentioning the alleged kidnapping, AP Perkins' preliminary findings by early afternoon on November 3, 2015 that evidence suggested the sexual encounter was consensual, AP Perkins' conclusion and reporting to CMS on November 4, 2015 that the investigation was complete and the incident was "mutual sexual contact between students" before speaking to Plaintiff and relying on information that Q.W. told him,[12] and AP Perkins' misrepresentations about his knowledge regarding the sexual assault to CMS and others; and (3) evidence that CMS had notice of multiple other incidents of sexual assault in the woods near the MPHS campus.

These facts share similarities to those in *Fairfax County*. When considering these facts, in the light most favorable to the Plaintiff, questions of fact exist sufficient to overcome summary judgment on her Title IX claim as to whether CMS was deliberately indifferent to the November 3 incident. Given the disputed facts, a reasonable juror could conclude CMS' "response to the [alleged] harassment or [the] lack [of any such response was] clearly unreasonable in light of the known circumstances." *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 269, 272-73 ("For instance, a jury could reasonably conclude that the school officials improperly trivialized and dismissed the reports of sexual assault; that they simply assumed, without adequate investigation, that the [] incident was a consensual sexual encounter between teenagers; that they neglected to take even the minimal

---

[12] Defendants argue they did not speak to Plaintiff because her parents did not allow it. However, this conclusion was made the day after the incident, and before Mrs. Doe sent an email to MPHS administration stating that the family did not wish to participate in the investigation. (Doc. No. 83-23 at 234:16-235:18). While the other records do not reflect this conclusion until November 9, AP Perkins was the responsible person investigating the incident on behalf of CMS and reached this conclusion prior to November 9, Mrs. Doe's email, and without ever speaking to Plaintiff. This is sufficient to create a question of fact for the jury as to whether CMS acted clearly unreasonable in responding to the November 3 incident.

step of checking in on Doe to make sure she was okay; . . . that they engaged in a 'blame-the-victim' mentality in investigating and dealing with the [] incident; or that their decision to believe [the assailant's] story over Doe's—even after Smith had initially lied to them about whether he had touched Doe—was likely attributable to bias.").  Moreover, a reasonable jury taking "a holistic view of [CMS'] series of alleged missteps [could] find that together they amount to 'an official decision . . . not to remedy [a Title IX] violation.'"  *Doe v. Morgan State Univ.*, 544 F.Supp.3d 563, 583-84 (D. Md. 2021); *Grier v. Gray*, No. 3:17-cv-00486-FDW-DSC, 2021 WL 4944346, at *4-5 (W.D.N.C. Oct. 22, 2021) (vacating its prior decision to grant of summary judgment in favor of school board because sufficient evidence existed to create an issue of facts on Title IX claim as it relates to notice and deliberate indifference in light of *Fairfax County*).

### C.  SRO Leak and AP Perkins' Motions for Summary Judgment[13]

#### 1.  Section 1983 Equal Protection Claim

Plaintiff's section 1983 equal protection claim alleges that SRO Leak and AP Perkins each acted to deprive Plaintiff of equal protection under the Fourteenth Amendment through their "deliberate indifference to [Plaintiff's] abduction and subsequent rape."  (Doc. No. 16 ¶¶ 132-133).  SRO Leak and AP Perkins argue they are entitled to qualified immunity.

"Section 1983 of Title 42 creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013).  Nevertheless, "[q]ualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil

---

[13] AP Perkins and CMS filed a joint Motion for Summary Judgment and SRO Leak filed a separate Motion for Summary Judgment.  However, because the claims against and issues raised by AP Perkins and SRO Leak are the same, they will be addressed together herein.

damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011). Thus, qualified immunity "shields federal and state officials from money damages unless the facts show (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Mays v. Sprinkle*, 992 F.3d 295 (4th Cir. 2021) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). It is within the court's discretion to address the questions in either order. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 699 (4th Cir. 2018). A right is "clearly established" when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 703-04 (quoting *Mullenix v. Luna*, 577 U.S. 7 (2015)). "To be clearly established, a legal principle 'must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority.'" *Id.* at 704 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018).

In 2018, the Fourth Circuit considered whether a university president was entitled to qualified immunity from a section 1983 equal protection claim for deliberate indifference to student-on-student harassment. *Hurley*, 911 F.3d 674. In *Hurley*, the Fourth Circuit held for the first time that "a victim of student-on-student sexual harassment can pursue an equal protection claim predicated on a school administrator's deliberate indifference to such harassment." *Hurley*, 911 F.3d at 702. However, in analyzing the second prong of his defense, the court concluded the university president was entitled to qualified immunity because at the time of the president's conduct, in 2014 and 2015, the right to be free from a school administrator's deliberate indifference to student-on-student sexual harassment was not clearly established. *Id.* at 704-06. The court reasoned that while controlling authority recognized a general right to be free from sexual

24

harassment at an educational institution, including student-on-student sexual harassment, those cases did not define the applicable standard for a claim premised on deliberate indifference and did not provide fair warning to the university president of his potential liability for violating that right. *Id.* at 704-05. Further, a robust consensus of persuasive authority had not clearly established the pertinent right at the time of the alleged wrongful conduct. *Id.* at 705-06.

Similarly, here, Plaintiff's section 1983 equal protection claim against SRO Leak and AP Perkins is premised on their deliberate indifference to student-on-student sexual harassment and they are entitled to qualified immunity because the right was not clearly established in 2015. Although in *Hurley*, the Fourth Circuit clarified that a victim of student-on-student sexual harassment may pursue an equal protection claim predicated on a school administrator's deliberate indifference to such harassment, it did not provide this guidance until 2018. Like in *Hurley*, at the time of SRO Leak and AP Perkins' actions, they did not have fair warning of their potential liability for violating Plaintiff's right to be free from deliberate indifference by a school administrator's response to student-on-student harassment.

Plaintiff does not appear to distinguish *Hurley*, but argues SRO Leak and AP Perkins are not entitled to qualified immunity because they acted in bad faith and their actions were not reasonable. However, the cases Plaintiff cites regarding qualified immunity do not support her position where, as here, Plaintiff has not alleged the violation of a clearly established right at the time the conduct occurred. For example, Plaintiff quotes *Doe v. Durham Pub. Sch. Bd. of Educ.*, which states "[a]s with qualified immunity, the availability of public official immunity depends on the reasonableness of the officer's action." No. 1:17cv773, 2017 WL 331143 (M.D.N.C. Jan. 25, 2019). However, this quote was in a portion of the opinion discussing public official immunity, not qualified immunity, and cites to an inapposite Fourth Circuit case addressing the

reasonableness of an officer's actions for qualified immunity in a case where the court concluded that there was a clearly established right at the time of the relevant conduct. Accordingly, SRO Leak and AP Perkins are entitled to summary judgment on Plaintiff's section 1983 equal protection claim.

### 2.    Negligence and Negligent Infliction of Emotional Distress Claims

Plaintiff's Amended Complaint alleges SRO Leak and AP Perkins were negligent because they breached their duties when they "decided not to respond immediately to urgent and serious reports that [Plaintiff] had been abducted and was in danger" while knowing of the "pervasive student-perpetrated sexual misconduct and coercion against female students in the woods." (Doc. No. 16 ¶¶ 151-161). SRO Leak and AP Perkins argue, among other things, they are entitled to public official immunity. Plaintiff argues SRO Leak and AP Perkins both acted with malice, corruption, and/or bad faith such that they are not entitled to public official immunity, and that questions of fact exist for the jury.

Under North Carolina law, "[t]he public [official] immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." *Campbell v. Anderson*, 576 S.E. 2d 726, 730 (N.C. App. 2003). However, public official immunity can be overcome if a plaintiff can show that the defendant's conduct was "(1) corrupt; (2) malicious; (3) outside of and beyond the scope of [his] duties; (4) in bad faith; or (5) willful and deliberate." *Smith v. Jackson City Bd. of Educ.*, 608 S.E.2d 399, 411 (N.C. App. 2005). However,

> [i]t is well settled that absent evidence to the contrary, it will always be presumed that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law. This presumption places a heavy burden on the party challenging the validity of public officials actions to overcome this presumption by competent and substantial evidence. Moreover,

> [e]vidence offered to meet or rebut the presumption of good faith must be sufficient by virtue of its reasonableness, not by mere supposition. It must be factual, not hypothetical; supported by fact, not by surmise.

*McCullers v. Lewis*, 828 S.E.2d 524, 535 (N.C. Ct. App. 2019).  In the context of public official immunity, "a malicious act is an act (1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another."  *Wilcox v. City of Asheville*, 730 S.E.2d 226, 230 (N.C. Ct. App. 2012).  Evidence of actual or constructive intent to injure may be allowed to show the malice exception to public official immunity.  *Id.* at 232.   "[T]he constructive intent to injure exists where the actor's conduct is so reckless or so manifestly indifferent to the consequences, where the safety of life or limb is involved, as to justify a finding of willfulness and wantonness equivalent in spirit to an actual intent."  *Id.* at 230-31 (quotation marks omitted).  "An act is corrupt when it is done with a wrongful design to acquire some pecuniary profit or other advantage."  *Green v. Howell*, 851 S.E.2d 673, 679 (N.C. Ct. App. 2020).

"The North Carolina Court of Appeals has held that school system superintendents, principals, and assistant principals are 'public officials' for purpose[s] of public official immunity."  *Doe*, 2019 WL 331143, at *20.  Police officers are also entitled to public official immunity.  *Campbell*, 576 S.E.2d at 376.  Public official immunity only insulates public officials from allegations sounding in negligence.  *McCullers v. Lewis*, 828 S.E.2d 524, 531 (N.C. Ct. App. 2019).

Plaintiff argues SRO Leak acted with malice, corruption, and bad faith when he allowed Q.W. a "violent and disturbed" student to abduct Plaintiff off campus for almost a full hour, failed to intervene for a half hour after notice that Q.W. was taking Plaintiff to the bamboo forest, and that he submitted reports to CMPD omitting the sexual assault to cover up his wrongdoing. However, the facts Plaintiff presents do not rise to the level of malice, corruption, and/or bad faith

necessary to overcome the public official immunity as a matter of law. First, although Plaintiff contends a question of fact exists as to whether SRO Leak saw Plaintiff being abducted by Q.W., the evidence Plaintiff points to does not support her contention that SRO Leak saw Plaintiff being abducted. Rather, the evidence shows SRO Leak saw Plaintiff and Q.W. turn around as if they were returning to the school, after which he no longer was able to see them during the alleged kidnapping. Additionally, SRO Leak did not know Q.W. or his history at MPHS or elsewhere when he saw Plaintiff walking off campus with Q.W. on the morning of November 3, 2015. Next, SRO Leak learned that Plaintiff was near Hassell Street at 7:31 AM and, according to Plaintiff, she was in his patrol car at or before 8:02 AM that same morning. And Plaintiff received text messages from J.D. and separately Mrs. Doe indicating that SRO Leak was coming to find her within minutes of informing them of Hassell Street.[14] This timeline, given the circumstances, even with an understanding of the potential danger of the bamboo forest, does not demonstrate malice, corruptness, or bad faith, which Plaintiff has a heavy burden to show. Last, Plaintiff surmises that SRO Leak submitted reports to CMPD omitting the sexual assault to cover up his wrongdoing. However, the evidence presented to the Court shows SRO Leak submitted the reports based on his understanding of the events and advice from multiple detectives in the sexual assault division advising him that the incident was not a sexual assault.

Plaintiff argues AP Perkins acted with malice, corruption, and bad faith because he failed to immediately alert CMPD that Plaintiff was allegedly kidnapped, and after Plaintiff was sexually assaulted his reporting acted to hide his own liability. However, the facts Plaintiff presents do not

---

[14] Plaintiff asserts SRO Leak and AP Perkins did not leave MPHS until at least 7:57 AM because that is was the time of the last message from J.D.'s phone before AP Perkins took it when he left MPHS; however, the Court observes that this timeline difficult to reconcile with Plaintiff's assertion that she was in SRO Leak's patrol car by 8:02 AM and calling her father.

rise to the level of malice, corruption, and/or bad faith necessary to overcome the public official immunity as a matter of law. The facts presented show that AP Perkins was alerted by SRO Leak, a CMPD officer, of the alleged kidnapping. Additionally, Plaintiff again surmises that AP Perkins submitted reports omitting information to cover up his own liability. However, there is no evidence to support this contention. Rather, the evidence shows that AP Perkins conducted a brief investigation, including speaking to Q.W., J.D., SRO Leak, and CMPD sexual assault detectives when reaching his conclusion that a sexual assault did not occur.

The public official immunity protects public officials from liability for negligence in the performance of their discretionary duties. Plaintiff has a heavy burden to show by substantial evidence that SRO Leak and AP Perkins acted as more than negligent, but with malice, corruption, or bad faith. She has failed to do that. Plaintiff's argument that SRO Leak and AP Perkins made false reports to cover up their own liability in how they responded on November 3, 2015, is mere speculation insufficient to overcome the public official immunity. Additionally, the actual facts Plaintiff presents to support her theory that SRO Leak and AP Perkins acted with malice, corruption, and bad faith, may raise questions of fact as to whether they acted negligently or even clearly unreasonably, but that is exactly the type of conduct the public official immunity protects against. Accordingly, SRO Leak and AP Perkins are entitled to the public official immunity on Plaintiff's negligence and negligent infliction of emotional distress claims. *See Roe v. Charlotte-Mecklenburg Bd. of Education*, No. 3:19-cv-00694-FDW-DSC, 2020 WL 5646105, at *15 (W.D.N.C. Sept. 22, 2020) (concluding plaintiff failed to overcome public official immunity where SRO took responsive action within the same day of learning of report of sexual abuse).

3.  Obstruction of Justice Claim

Obstruction of justice is a common law offense when a person does "any act which prevents, obstructs, impedes, or hinders public or legal justice." *In re Kivett*, 309 S.E.2d 442, 462 (1983). Obstruction of justice can take a variety of forms, and is "very fact-specific and context-driven." *Houck v. Howell*, No. 5:14-CV-00187-RLV-DCK, 2016 WL 1599806, at *8 (W.D.N.C. Apr. 21, 2016). "[A]ny action intentionally undertaken by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy will suffice to support a claim for common law obstruction of justice." *Blackburn v. Carbone*, 703 S.E. 2d 788, 795 (2010). For example, destroying, concealing, or fabricating of evidence are actions that may amount to obstructing justice. *Braswell v. Medina*, 805 S.E.2d 498, 509-510 (N.C. Ct. App. 2017). Obstruction of justice claims not only seek to remedy actual and successful obstruction, but it also remedies attempts to prevent, obstruct, impede, or hinder justice. *Reed v. Buckeye Fire Equipment*, 241 Fed. App'x 917, 928 (4th Cir. 2007). Claims premised on acts that occurred solely in the course of an officer's criminal investigation and unrelated to the ability to seek and obtain a legal remedy are not viable. *Braswell v. Medina*, 805 S.E.2d 498, 509-510 (N.C. Ct. App. 2017); *Evans v. Chalmers*, 703 F.3d 636, 658 (4th Cir. 2012); *Massey v. Ojaniit*, 759 F.3d 343, 358 (4th Cir. 2014) (dismissing obstruction of justice claim against officer due to dearth of case law on issue in North Carolina); *Houck*, 2016 WL 1599806, at *8.

Here, Plaintiff argues SRO Leak impeded or hindered the investigation into Plaintiff's alleged kidnapping and sexual assault and obstructed her remedies criminally against Q.W., in CMS' disciplinary process, under Title IX, and in the CMPD IA investigation, by, among other things, threatening Plaintiff of the consequences for making a false report of sexual assault, offering biased information to other CMPD officers also investigating the incident which ultimately influenced CMPD to report the incident as a non-criminal truancy, and lying during the

CMPD IA investigation. However, other than Plaintiff's speculation, there is no evidence of SRO Leak's intent to impede or hinder Plaintiff's ability to seek a legal remedy. Rather, the evidence suggests SRO Leak investigated the incident and made reports of the incident based on the facts as he understood them and the guidance he received from CMPD sexual assault detectives. The errors Plaintiff believes SRO Leak made and her general speculation that SRO Leak made false reports to avoid his own liability do not demonstrate SRO Leak's intent to hinder or impede Plaintiff's legal remedies.

As to AP Perkins, Plaintiff argues that questions of fact exist as to whether he obstructed justice, pointing to, among others things, the fact that he failed to share and report all relevant information he learned including that Plaintiff was sexually attacked which he saw on J.D.'s cell phone, failed to report Plaintiff's alleged kidnapping, misrepresented Plaintiff's appearance after the incident, conducted a biased investigation and reached a conclusion within a day that the sexual encounter was consensual without speaking to Plaintiff, and withheld or destroyed evidence regarding his investigation into the incident, including his notes and security camera footage. Again, here, Plaintiff restates the facts and what she believes to be errors made by AP Perkins during the response and investigation of the November 3, 2015 incident, but other than mere speculation there is nothing evidencing an intent to impede Plaintiff's ability to seek legal remedies.

The Court also does not find how SRO Leak and/or AP Perkins' handled other sexual assault incidents create any questions of fact in this case. At its heart, it appears Plaintiff's obstruction of justice claim is a restatement of her frustration with the investigation and the ultimate conclusions reached during the investigation, but frustration does not create an intent to obstruct justice. Accordingly, the Court will grant summary judgment in favor of SRO Leak and

31

AP Perkins on Plaintiff's obstruction of justice claim. *Blackburn*, 703 S.E. 2d at 797 (2010) ("[G]iven the absence of any . . . specific facts tending to show that Dr. Carbone deliberately inserted an inaccuracy into his report and then intentionally failed to correct it for the purpose of obstructing, impeding, or hindering Plaintiff's ability to maintain his automobile accident claim, we conclude that the trial court properly granted summary judgment in favor of Defendants.").

### D.  City of Charlotte and Kerr Putney's Motion for Summary Judgment

Plaintiff's remaining claim against the City and Putney alleges they negligently hired, trained, retained, and supervised SRO Leak.  As an initial matter, Putney is sued only in his official capacity and is entitled to summary judgment because the claim is duplicative of the claim against the City. *See Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *Muslim v. Carmichael*, No. 3:16-cv-433-FDW, 2019 WL 1795951, at *19 (W.D.N.C. Apr. 24, 2019).  However, as discussed herein, the City is not entitled to summary judgment.

A plaintiff must show the following elements for a negligent hiring, supervision, and retention claim:

> (1) the specific negligent act on which the action is founded; (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision; and (4) that the injury complained of resulted from the incompetency proved.

*Foster v. Nash-Rocky Mount Cnty. Bd. of Educ.*, 665 S.E.2d 745, 750 (N.C. Ct. App. 2008) (cleaned up).  Before an employer can be liable for negligent hiring, supervision, and retention, the plaintiff must prove that the employee committed a tortious act. *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 124 (N.C. Ct. App. 1986).  The application of a theory of independent negligence in hiring, training, supervising, or retaining an employee is important in cases where

the employee's acts were not within the scope of his or her employment. *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 124 (N.C. Ct. App.1986). In such a case, this theory allows a plaintiff to establish liability on the part of the employer where no liability would otherwise exist. *Id.* In other words, these claims arise when an employee is acting outside the scope of employment, and may be asserted as an alternative to *respondeat superior* liability because the employee is acting outside the scope of employment. *Pracht v. Saga Freight Logistics, LLC*, No. No. 3:13–CV–529–RJC–DCK, 2015 WL 5918037, at *8 (W.D.N.C. Oct. 9, 2015); *Brown v. Tethys Bioscience, Inc.*, No. CIV.A. 1:10–1245, 2012 WL 4605671, at *6 n. 4 (S.D. W.Va. Oct.1, 2012).

The City argues it is entitled to summary judgment on the negligent hiring, supervision, and retention claim because SRO Leak admits and the City "has not disputed that SRO Leak was acting within the course and scope of his employment," such that *respondeat superior* is the appropriate remedy. However, here, a question of fact exists as to whether SRO Leak was acting within the scope of his employment at all times relevant. First, SRO Leak's Answer contains inconsistencies about whether he admits or denies that he was acting within the scope of his employment, particularly when looking at the facts under a summary judgment standard. (Doc. Nos. 38 ¶¶ 17, 125). Further, the City's Answer denies SRO Leak was acting "within the scope of his employment and authority while serving in his official capacity."[15] Thus, summary judgment on this ground is not appropriate. (Doc. No. 16 ¶¶ 58, 125; Doc. No. 37 ¶¶ 58, 125). Next, the City argues it is entitled to summary judgment because SRO Leak was not negligent and,

---

[15] Moreover, it does not appear that Plaintiff brought the negligence claim against SRO Leak in his official capacity, which is the claim the City relies on for its argument that *respondeat superior* is the only proper claim here. Plaintiff's negligence claim does not reference SRO Leak acting in his official capacity. *See* Doc. No. 16 ¶¶ 151-153; *see also* Doc. No. 34 at 7 ("Ms. Doe has brought state-law claims for negligence [which is identical to the negligence claim against SRO Leak] . . . against Defendant Perkins in his individual capacity only.").

if he was, Plaintiff was contributorily negligent. However, as the facts discussed in detail above demonstrate, numerous questions of fact exist as to whether SRO Leak was negligent and whether Plaintiff was contributorily negligent. Finally, Plaintiff submitted sufficient evidence to create questions of fact as to SRO Leak's prior acts of negligence in responding to prior allegations of sexual assault by students. (Doc. No. 150 ¶¶ 2-3). Accordingly, the City is not entitled to summary judgment.

## IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Defendants City of Charlotte and Kerr Putney's Motion for Summary Judgment (Doc. No. 63) is **GRANTED IN PART** and **DENIED IN PART**, specifically it is **GRANTED** as to the remaining claim against Defendant Kerr Putney in his official capacity only and **DENIED** as to the remaining claim against the City of Charlotte;

2. Defendants Charlotte Mecklenburg Board of Education and Anthony Perkins' Motion for Summary Judgment (Doc. No. 66) is **GRANTED IN PART** and **DENIED IN PART**, specifically it is **GRANTED** as to the claims against Defendant Anthony Perkins and **DENIED** as to remaining claim against Defendant Charlotte Mecklenburg Board of Education;

3. Defendant Bradley Leak's Motion for Summary Judgment (Doc. No. 67) is **GRANTED**;

4. The Magistrate Judge's Memorandum and Recommendation (Doc. No. 188) is **ADOPTED IN PART**;

5. The Plaintiff's Motion to Compel Discovery by Defendants Board and Perkins and for Sanctions (Doc. No. 170) is **GRANTED IN PART** and **DENIED IN PART**;

34

6. The Plaintiff's Motion for Sanctions Against Defendants City of Charlotte & Kerr Putney (Doc. No. 177) is **GRANTED IN PART** and **DENIED IN PART**;

7. Except as otherwise specifically granted, Plaintiff's Rule 56(d) Motion (Doc. No. 92) is **DENIED**; and

8. Plaintiff shall submit an accounting of reasonable attorney's fees and costs within fourteen (14) days of this Order.

Signed: August 12, 2022

Robert J. Conrad, Jr.
United States District Judge